No. 89-106

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

    Plaintiff and Respondent,

-vs-

MICHAEL D. ALBRECHT,

    Defendant and Appellant.



APPEAL FROM:  District Court of the Sixteenth Judicial District,
In and for the County of Custer,
The Honorable A. B. Martin, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        James G. Hunt, Hunt & Dix Law Offices, Helena, Montana

    For Respondent:

        Hon. Marc Racicot, Attorney General, Helena, Montana
Jennifer Anders, Assistant Attorney General, Helena
Keith D. Haker, County Attorney, Miles City, Montana

Submitted on Briefs:  March 8, 1990

Decided:  April 26, 1990

Filed:

_____
Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Defendant Michael Albrecht appeals his 1985 robbery conviction from Custer County following revocation of his suspended sentence in 1988 for parole violations. The defendant, who was returned to prison after the suspended sentence was revoked, filed a petition for post-conviction relief. Because a notice of appeal had been timely filed but never docketed in 1985, the Attorney General's answer to defendant's petition noted that defendant did not receive proper representation on appeal. Counsel for defendant was then appointed and a transcript of the 1985 lower court proceedings prepared. Upon review of the 1985 proceedings we affirm the trial court's judgment.

Defendant presents two issues for review:

1. Did the trial court commit reversible error when it refused to instruct the jury that theft is a lesser-included offense of robbery?

2. Was the defendant denied effective assistance of counsel at trial?

On January 9, 1985, when Cheryl Zabrocki, a teller at First Security Bank in Miles City, Montana, was approached by a man who asked her to take out all of the money in her drawer and lay it on the counter, she asked if he were kidding. The man assured Ms. Zabrocki he was not kidding, and showed her a paper bag containing a device that appeared to be a bomb, saying "You've got 30 seconds to lay it out on the counter." As Ms. Zabrocki emptied the inside

portion of her cash drawer, the man said that he knew what he was doing and that she should not forget to include the hundred- and fifty-dollar bills. Ms. Zabrocki gave the man all of the money in the front half of her drawer, totalling $4,926. She did not, however, give the man the money in the back of the drawer which he could not see. The robber then left the bank.

The bank personnel immediately notified local law enforcement authorities of the robbery and gave a description of the bank robber. Because a meter maid had earlier noticed a man matching the robber's description acting suspiciously, the man was quickly apprehended. When authorities surrounded his vehicle, the suspect, later identified as Michael Albrecht, jumped out of his car and stated "I did it, I did it, I have got the money." Law enforcement officials recovered $4,926 in cash on defendant's person and a brown paper sack containing what appeared to be an electronic device in the defendant's car. The device proved to be a non-functional conglomeration of emergency road flares, a flashlight battery, a switch and some wires. Defendant was arrested without incident.

At his January 18, 1985 arraignment, defendant requested appointed counsel. Upon determining that the defendant was indigent, District Court Judge A.B. Martin appointed J.S. Wheatcroft to represent the defendant.

Attorney Wheatcroft informed Judge Martin in a March 11 letter that defendant felt he might not be receiving adequate representation. A hearing concerning the adequacy of trial

counsel's representation was held on March 18. After inquiry and discussion, the judge refused to appoint new counsel for the defendant because the trial had already been scheduled and the jury notified. Defendant was given the option of continuing with Mr. Wheatcroft's representation or representing himself.

At trial, held on March 20, appointed counsel Wheatcroft conducted the defense and the jury returned a verdict of guilty. Defendant was subsequently sentenced to seven years in prison with four years suspended. Originally, defendant received an additional two-year sentence for use of a dangerous weapon, but that portion of the sentence was later vacated. A notice of appeal was timely filed but never docketed, and no further action taken on the appeal.

In May of 1987 defendant was released from the Montana State Prison to begin serving the suspended portion of his sentence. Defendant was returned to prison following an August 22, 1988 hearing on the petition to revoke the suspended sentence. Defendant filed a petition for post-conviction relief. The State's response to that petition noted that defendant did not receive proper representation on appeal in 1985. This Court then ordered the matter remanded for preparation of a trial transcript and appointment of appellate counsel. The result of our previous order is this appeal.

I.

Defendant first argues that the trial court erred in refusing to instruct the jury that theft is a lesser-included offense of robbery. The trial court refused the instruction based on our holding in State v. Madera (1983), 206 Mont. 140, 670 P.2d 552. We affirm the trial court's decision.

Defendant was charged with robbery, a felony, under § 45-5-401(1)(b), MCA, which reads:

> (1) A person commits the offense of robbery if in the course of committing a theft he:
>
> . . .
>
> (b) threatens to inflict bodily injury upon any person or purposely or knowingly puts any person in fear of immediate bodily injury[.]
> . . .

The definition of "included offense" is found at § 46-11-501(2), MCA, which reads, in part:

> (2) An offense is an "included offense" when:
>
> (a) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.] . . .

While this definition is found in the part of Title 46 concerning the effect of multiple charges and former prosecutions, this Court has previously held that the definition is also applicable in determining whether an instruction on a supposed lesser-included offense is required. State v. Hamilton (1980), 185 Mont. 522, 534, 605 P.2d 1121, 1128, cert. denied, 447 U.S. 924, (1980).

The gist of defendant's argument is that the State must prove

5

a theft in order to prove robbery, and theft, therefore, is a lesser-included offense of robbery. In Madera, we addressed this argument adopting the "Blockburger test" to determine if theft is a lesser-included offense of robbery. We noted:

> The "Blockburger test" (Blockburger v. United States (1932), 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309) states:
>
> > "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not . . . . "
>
> However, in Iannelli v. United States (1975), 420 U.S. 770, 785, fn. 17, 95 S.Ct. 1284, 1294, fn. 17, 43 L.Ed.2d 616, 627, fn. 17, the Supreme Court explained the Blockburger test saying:
>
> > "If each requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes . . . . "
>
> Our statute, section 46-11-502(1), MCA, prevents prosecution for more than one offense, when one offense is included in the other.
>
> In State v. Ritchson (1981), Mont., 630 P.2d 234, 38 St.Rep. 1015, we considered the Blockburger rule, and determined the applicable test is whether each charge requires proof of a fact which the other does not, to determine if there is indeed a lesser-included offense.
>
> We look to the statutes and not to the facts of the individual case to make that determination. Ritchson, 630 P.2d at 237, 38 St.Rep. at 1018.

Madera, at 151, 670 P.2d at 557-58. The Madera Court concluded that because felony theft required the additional element of proof that property taken exceeds a certain dollar amount, theft is not a lesser-included offense of robbery.

6

The decision in <u>Madera</u> was confirmed on appeal to the federal court system. LaMere v. Risley (9th Cir. 1987), 827 F.2d 622. The <u>LaMere</u> court, in affirming the Montana Supreme Court and United States District Court, distinguished the two crimes:

> Robbery requires proof that a defendant threatened or put another in fear of bodily harm; felony theft requires no such showing. Felony theft, on the other hand, requires the prosecution to prove that the personalty's value exceeds $150 [raised to $300 in 1983]. Mont.Code.Ann. § 45-6-301(1)(a)(5), (1983). A conviction for robbery does not.

<u>LaMere</u> at 626.

But in the case at bar, defendant argues he requested the jury be instructed that theft is a lesser-included offense because evidence was contradictory as to whether Ms. Zabrocki was put in fear during the incident. On direct examination, Ms. Zabrocki testified she gave defendant the money because she believed that if she did not give defendant the money she was in danger of bodily harm because of the device in the sack. On cross-examination, Ms. Zabrocki's statement to police officers immediately following the incident was brought out. In that statement Ms. Zabrocki described defendant as "really nice" when he first approached her and said that she handed the money over to defendant because that was what she was trained to do. Defendant contends that if the jury found that defendant does not put anyone in fear of bodily harm he could be convicted only of theft and not robbery, and an instruction that theft was a lesser-included offense of robbery was therefore proper.

We have, however, ruled that theft is not a lesser-included

offense of robbery, <u>Madera</u>, at 151, 670 P.2d at 558, albeit for different reasoning. Nevertheless, we decline to hold differently. Not only does theft require an additional element of proof regarding value, our statutes specify that commission of theft is not required for commission of a robbery. Section 45-5-401, MCA, requires only that the actor "be in the course of committing the theft." Under the statute, in order for a robbery charge to adhere, a person does not actually have to complete the theft but only be in the course of committing the theft.

The Criminal Law Commission Comments to § 45-5-401, MCA, further illustrate that theft is not a lesser-included offense of robbery:

> Common-law robbery was theft of property from the person or in the presence of the victim by force or by putting him in fear either or immediate bodily injury or of certain other grievous harms. The above draft does not explicitly include the traditional basis for classifying robbery as taking property from the person or in the presence of a person, but approaches the crime as one of immediate danger to the person and relies on the condition of violence or threatened violence to distinguish the crime from ordinary theft. The gist of the offense is taking by force or threat of force.

> The above provision would apply where property was not taken from the person or from his presence. For example, an offender might threaten to shoot the victim in order to compel him to telephone directions for the disposition of property located elsewhere. Further, it is immaterial whether property is or is not obtained. This seems compatible with the theory of treating robbery as an offense against the person rather than against property. Hence, a completed robbery may occur even though the crime is interrupted before the accused obtained the goods, or if the victim had no property to hand over. . .

<u>Criminal Law Commission Comments</u>, Mont. Crim. Code, 1973 Annotated (1980 Revised Edition), p. 184.

8

It is clear from Montana statutes, commission comments and case law that theft is not, and was never intended to be, a lesser-included offense of robbery. We hold that the District Court was correct in refusing defendant's request to instruct that theft is a lesser-included offense of robbery.

## II.

Defendant next argues that he was denied effective assistance of counsel at trial. The basis for his argument is that attorney Wheatcroft failed to investigate a lack of mental state defense. Defendant contends that trial counsel was well aware of certain indications that defendant was unable to form either of the mental states, purposely or knowingly, necessary to a robbery conviction. The alleged indications of inability to form the requisite mental state are that:

> 1) several years before this incident defendant had been involved in a motorcycle crash which left him in a coma for several weeks, causing at least some brain damage;
>
> 2) at the time of this incident, defendant was under severe distress because he had been unemployed for two months and could not support his family; and
>
> 3) at the time of the incident, defendant was in a weakened state as a result of having slept in his vehicle, without heat, for several nights in January and not having eaten for at least two days due to a lack of money.

Defendant argues that given these indications of his mental condition, trial counsel had an obligation to pursue an investigation into whether defendant had one of the requisite mental states at the time of the incident. The trial record shows

9

that Wheatcroft was aware defendant had been unemployed for some time and had slept in his car and had eaten very little for two days prior to the incident. The record is inconclusive, however, regarding Wheatcroft's knowledge of defendant's involvement in a traffic accident. Wheatcroft's only reference to the accident occurred after the trial at the sentencing hearing when he elicited testimony from the defendant that defendant had suffered "severe brain damage" as the result of an accident. There was no medical evidence to confirm this testimony.

This Court follows the two-prong test adopted by the United States Supreme Court to determine whether ineffective assistance of counsel has occurred:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

State v. Stewart (1988), 235 Mont. 239, 241-42, 767 P.2d 296, 297 (quoting Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693).

Defendant contends attorney Wheatcroft's performance was deficient because he did not consider the lack of mental state defense which prejudiced the defendant. It is clear that Wheatcroft did consider the lack of mental state defense, but rejected it as meritless. At the March 18, 1985 hearing on substitution of counsel, Wheatcroft told the District Court:

> Conferring with the client, or with the defendant, it didn't appear that he'd be a real good candidate for an insanity defense, and it was -- I interposed a defense

10

of economic compulsion largely to keep alive -- to keep the case alive while I was undergoing plea bargaining efforts.

Such consideration on the defense attorney's part is sufficient. In making a preliminary determination of competency for the purpose of asserting a mental deficiency defense, the attorney need only rely on his or her experience with the legal profession. This Court refused to impose more of a duty on defense attorneys evaluating a client's mental condition:

> Defendant argues that trial counsel erred by failing to require that defendant undergo physical and mental examinations in preparing the defense and prior to sentencing. This argument imposes an unacceptable burden on defense attorneys by requiring them to exercise diagnostic skills beyond their training. In this case the record suggests nothing that would evidence that defendant was suffering from mental disease or defect. Trial counsel's performance was not deficient under these circumstances.

State v. Long (1986), 223 Mont. 502, 511, 726 P.2d 1364, 1370.

In the case at bar, as in Long, nothing in the record suggests defendant was suffering from mental disease or defect sufficient to preclude his formation of the requisite mental state of purposely or knowingly. In fact the record indicates just the opposite. At the substitution of counsel hearing, defendant appeared confident and articulate, stating that he wished to have new counsel appointed because he found Wheatcroft, "very incompetent and immature and very erratic emotionally and him and I definitely do not see eye to eye on this thing and he hasn't put anything into it yet."

The trial court denied defendant's request for another attorney. Before trial, Wheatcroft advised defendant to enter a

11

plea of guilty. Defendant, however, insisted the case go to trial on the theory that the bomb was so patently phony that the teller could not reasonably have been in fear. At trial defendant informed the court that he would actually participate in his own defense, instructed Wheatcroft to waive the opening statement, and indicated he would be advising Wheatcroft throughout the proceedings.

Defendant's behavior as reflected in the record indicates his ability to form the mental intent of purposely or knowingly. Defendant obviously understood the charge against him. Defendant was able to formulate his own theory of defense and demanded his case be presented under that theory. Such assertiveness belies defendant's contention that he was incapable of acting with the purpose or knowledge necessary to a robbery conviction.

Furthermore, the record demonstrates that defendant acted purposely or knowingly at the time of the robbery. At trial defendant testified with detailed accuracy regarding places he had stopped and inquired for work, the route he travelled, places he stayed, and how much money he had at each point in his travels. Defendant testified regarding his arrival back in Miles City and events on the day of the incident:

> Q. Okay. What did you do when you got here in Miles City?
>
> A. Well, in the Miles City area, I got -- it wasn't in the morning. It would be the afternoon of January 7th, but I arrived in Miles City and it was in the late afternoon, and I walked down Main Street and stopped into a few of the stores and asked them if they were looking for any type of help, and I

12

walked through the bars and I questioned all the farmers I could find, and I asked the bartenders if they had heard of anybody that was looking for help.

Q. Okay, and how long did this go on?

A. This happened while it was late in the afternoon of the 7th, and that night I slept in may car, about a block north of the SA store here, and then the following morning I was very cold, and I got up and it took me quite awhile walking to get warmed up, and then I had not eaten since it was Sunday, the 6th I guess it would be, and that was the last time I had eaten and I was still getting fairly cold, but I was walking around to warm up and once again I proceeded to go into some places and through the same bars and asked, and nobody had heard yet of anything of a job opening anywhere yet.

Q. Okay. Do you recall the events of January 9th of this year?

A. Well, the morning of January 9th. It was -- I'm not sure just what the time was, but at eight o'clock I woke up and it was awful cold that morning, and it took quite awhile walking around and also trying to warm up and different things, and I was also getting very hungry, and I decided that somehow I would have to come up with some money here or something for food and lodging, and I had a family at home yet too, that I didn't want them evicted or kicked out.

Q. So what did you do?

A. Well, from the time I woke up, I walked around to warm up, and it took me awhile, and then I admit, it wasn't a very logical thing to do, but I decided that I had to come up with some money some way, but I wasn't sure how I was going to do it yet, and -- well, I devised the flares the way you seen them arranged, and I didn't know what I was going to do when I devised these flares, and I walked around with them for an hour and a half.  .

Q. What did you do then?

13

A. Well, after walking around?

Q. What did you do then?

A. After walking around and all of that, it was about ten minutes before I went into the bank and that's when I decided that I was going to go into the bank.

Q. What happened in the bank?

A. Well, I just walked in the door and it was 11:13 and I walked up to the first lady and asked her for all of the money.

. . .

Defendant's testimony demonstrates his ability to recall the incident and the details surrounding it. Such recollection tends to show the defendant was aware of his conduct and thus negates his contention he lacked the mental state of purposely or knowingly. State v. Raty (1984), 214 Mont. 114, 117, 692 P.2d 17, 19.

Moreover, the defendant's mental state may be inferred from circumstantial evidence, including a defendant's actions and evidence found surrounding the alleged offense. State v. Trask (1988), 234 Mont. 380, 385, 764 P.2d 1264, 1267; State v. Hardy (1980), 185 Mont. 130, 136-37, 604 P.2d 792, 796; State v. Jackson (1979), 180 Mont. 195, 205, 589 P.2d 1009, 1015. Given defendant's testimony concerning his constructing the bomb and transporting it into the bank, the jury could properly infer defendant entered the bank with the mental intent of purposely or knowingly instilling fear in the bank teller.

Defendant next implies that his inadequate representation resulted from the District Court's refusal to provide substitute

14

counsel. It is within the sound discretion of the trial court to rule on substitution of counsel, and absent abuse of that discretion the decision will not be overturned. State v. Martz (1988), 233 Mont. 136, 139, 760 P.2d 65, 67; State v. Long (1983), 206 Mont. 40, 45, 669 P.2d 1068, 1071 (citing Good v. United States (9th Cir. 1967), 378 F.2d 934, 935).

The trial court's duty, when considering a motion for substitution of counsel, is to make adequate inquiry into the complaint of the defendant and to discover whether the conflict was so great as to result in a total lack of communication. Martz, at 139-40, 760 P.2d at 67 (citing Brown v. Craven (9th Cir. 1970), 424 F.2d 1166 and United States v. Mills (9th Cir. 1979), 597 F.2d 693). The District Court met its burden, inquiring of defendant what his reasons for wanting a new attorney were. Defendant replied that he and Wheatcroft did not see eye to eye and that he felt Wheatcroft had not "put anything into it yet." The trial judge then asked Wheatcroft what he had done about the case. Wheatcroft indicated he had read statements of people involved, including the defendant's, held discussions with officers involved, considered potential defenses, conferred with defendant and attempted plea bargains.

Obviously, the conflict between defendant and Wheatcroft had not resulted in total communication breakdown. While the attorney and client may not have experienced a "meaningful relationship," they did not have a total lack of communication. Martz, at 140, 760 P.2d at 67 (citing Morris v. Slappy (1983), 461 U.S. 1, 103

15

S.Ct. 1610, 75 L.Ed.2d 610).

No showing of ineffective representation based upon a total lack of communication was made. Therefore, the District Court's decision will not be disturbed.

We affirm.

_John Conway Harrison_
Justice

We concur:

_J. A. Turnage_
Chief Justice

_John C. Sheehy_

_Justices_