No. 88-475

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

      Plaintiff and Respondent,

  -v-

VERN KILLS ON TOP,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
In and for the County of Custer,
The Honorable C. B. Sande, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      John S. Forsythe, Forsyth, Montana

      For Respondent:

      Clay R. Smith, Asst. Attorney General, Helena, Montana

      Keith D. Haker, County Attorney, Miles City, Montana

FILED

MAY 21 1990

Filed:
*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Submitted: March 13, 1990

Decided: May 21, 1990

Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from the District Court of the Sixteenth Judicial District, Custer County, Montana. Mr. Vern Kills on Top was convicted by jury of robbery, aggravated kidnapping and deliberate homicide. He was sentenced to 40 years for robbery, and sentenced to death for each of the latter two convictions. He appeals both the convictions and the sentences. We affirm.

The issues presented for our review are:

1. Whether the amended information sufficiently informed defendant of the offenses with which he was charged.

2. Whether the District Court had jurisdiction over the crimes for which defendant was convicted.

3. Whether defendant was denied the right to a speedy trial.

4. Whether the District Court abused its discretion by denying defendant's motion to compel pretrial depositions of defendant's accomplices.

5. Whether defendant was prejudiced by an order of the District Court in the companion case of Lester Kills on Top.

6. Whether the District Court erred in denying defendant's motion to suppress.

7. Whether the District Court erred in admitting certain evidence at trial.

8. Whether accomplice testimony was sufficiently corroborated.

9. Whether the District Court erred in instructing the jury.

10. Whether there was prosecutorial misconduct at trial, and

if so, whether defendant was thereby prejudiced.

11. Whether the District Court erred in denying defendant's motion for a mistrial.

12. Whether the District Court abused its discretion by utilizing the verdict form offered by the State.

13. Whether certain factual findings by the District Court were supported by substantial evidence.

14. Whether imposition of the death penalty is constitutional under the mandatory review criteria of § 46-18-310, MCA.

15. Mandatory Supreme Court sentence review pursuant to § 46-18-310, MCA.

On October 16, 1987, defendant, Vern Kills on Top, who will be referred to in this opinion as defendant, and his brother, Lester Kills on Top, were staying at the residence of George Bell in Miles City, Montana. Also staying at that residence were Diane Bull Coming and Doretta Four Bear. That evening defendant, Lester, and Diane went to a few local bars. A little after midnight, they went back to the house where they were staying and woke Doretta, requesting that she come with them. The four individuals then went to the Golden West Lounge in Miles City. Mr. John Martin Etchemendy, Jr. also went to the Golden West Lounge that evening. He was with a friend, Steve Hathaway, who drove Mr. Etchemendy's pickup to the lounge. When Mr. Etchemendy was ready to leave the lounge, at approximately 2:00 a.m., he could not locate his pickup. Diane Bull Coming testified that defendant offered to help him find his pickup. Mr. Etchemendy got into the car with

3

defendant, Lester, Diane and Doretta. The car was a black Dodge Duster, belonging to defendant's girlfriend, Cathy Meshnik. Defendant was driving the car. Mr. Etchemendy was in the back seat with Lester and Diane. Diane testified that Lester began speaking in his native tongue of Northern Cheyenne, saying the group should roll Etchemendy and steal from him. The group looked a few places for the pickup, then headed out of town and turned onto Cemetery Road. Mr. Etchemendy lives at the end of this road. Doretta testified that after Mr. Etchemendy indicated they were going the right way, defendant stopped the car and turned it around, heading out of Miles City and south toward Broadus. Outside of Miles City the car stopped and the men got out to urinate. Diane Bull Coming testified that Lester and Mr. Etchemendy began fighting; however Mr. Etchemendy voluntarily got back in the car.

Doretta testified that shortly after this, Lester attempted to force Mr. Etchemendy to take some pills. Mr. Etchemendy resisted and a fight began in the back seat between Lester and Mr. Etchemendy. Doretta testified that during the fight Diane removed the wallet from Mr. Etchemendy's pocket. Diane testified that she handed it to defendant who took credit cards and employment checks from Colstrip Garbage Disposal out of the wallet. The fight continued and Diane and Doretta testified that defendant stopped the car saying that he "wanted in on some of this." He stopped the car on Tongue River Road and defendant and Lester then took the victim outside the car and continued beating him. Doretta testified that she saw both defendant and Lester kicking the victim

4

while he was lying on the ground. Both Doretta and Diane testified that the victim was screaming and pleading with defendant and his brother to stop. Doretta testified that defendant then got into the back seat with the victim and attempted to choke him. She testified that a short time later, defendant asked the driver to stop the car, whereupon defendant told the victim to get out and take his clothes off. Diane testified that at this point defendant and Lester placed the nude victim into the trunk of the car.

The group traveled on to Ashland, Montana, where they picked up LaVonne Quiroz at about 5:00 a.m. Defendant and LaVonne attempted to siphon some gas in Ashland, and they also stole a red tool box. Doretta testified that they then drove to Rabbit Town, where she fled from the group by running to a friend's house. Diane and LaVonne testified that they stopped the car at a water trough where defendant and Lester washed blood off their hands. The brothers also removed their shirts at this stop. Diane testified that the trunk was opened at this stop and she saw the victim. She stated that he was all beat up, bloody, that his eyes and mouth were swollen, and his hair was all matted down with blood.

Diane testified that the group drove to Broadus, where Lester attempted to cash one of the checks taken from the victim. They were able to cash the check at a bar and Lester divided the money between himself and defendant.

Diane testified that at her suggestion the group decided to drive to Gillette, Wyoming. After leaving Broadus, Lester passed

5

a blindfold to the victim through an opening in the back seat, instructing him to tie it over his eyes. They then stopped the car so the victim could urinate. LaVonne Quiroz testified that before they got out of the car, defendant asked her to hand him a metal pipe which was in the car. She stated that Lester grabbed the pipe and while standing in the trunk holding the pipe up, told the victim he would hit him if he ran. Diane testified that at the stop, defendant took the blindfold off the victim, whereupon Lester became angry and told defendant they would now have to kill the victim. Diane testified that defendant agreed with Lester. She testified that defendant and Lester forced Mr. Etchemendy to get back into the trunk. Lester then attempted to force him to drink a mixture of beer and Ever-Clear in an attempt to make him pass out.

Diane testified that while they were driving Lester spoke to the victim through the back seat. Mr. Etchemendy informed Lester that he was married and had two little boys.

The group next stopped at Biddle, Montana, off the reservation, where Lester cashed the second check taken from Mr. Etchemendy. After purchasing food and drink the proceeds were shared with defendant. Diane testified that defendant purchased gasoline with one of the victim's credit cards.

The group arrived in Gillette, Wyoming in the afternoon. Lester purchased a new shirt and jeans and changed clothes. He and Diane then went into the Lobby Bar. The car was parked on the street. At trial LaVonne testified that the victim began pounding

6

on the trunk and hollering, "Help me." She testified that defendant instructed her to move the car into the alley at the side of the bar. Defendant and LaVonne then joined Lester and Diane in the Lobby Bar.

Diane testified that while the four of them were in the bar Lester told defendant they had to "get rid of" the victim or they were going to get caught. She testified that defendant agreed with Lester, although defendant wanted to wait. She testified that Lester asked for the keys, that defendant gave him the keys, and that she and Lester left.

Lester and Diane drove out of town, turned off on a gravel road and drove over a hill where they were not visible from the highway. Diane testified that Lester then opened the trunk and started hitting the victim with a pipe. She stated that Mr. Etchemendy said, "Oh, God, no, God, no, don't do this to me," but that Lester kept hitting him, while blood spurted from his head. Lester continued to hit him in the head with a tire iron, and then a rock. Lester then closed the trunk, got in the car, and Diane drove away. Before reaching the main highway, they encountered a Blazer driven by a woman, who pulled over to let them pass. Diane testified that Lester stated he was going to shoot the victim. He put a bullet in a vise grip. When Diane stopped the car, Lester got out and attempted to shoot the victim by hitting the bullet with a hammer. Diane testified that she heard a sound similar to a firecracker. Diane and Lester continued to drive back towards Gillette, but they had two flat tires so they stopped at the Rustic

7

Lounge.

Here, Diane testified that Lester attempted to cut the victim's throat with a small knife. From the bar, Diane called defendant and LaVonne and told them to take a taxi and join them. She testified that Lester later came inside and said the victim was dead.

LaVonne Quiroz testified that she and defendant purchased clothing at a store in Gillette while waiting for Lester and Diane to return. While at the bar, they received a phone call from Diane asking them to come to the Rustic Inn. She stated that they took a cab to the Rustic Inn. After the second flat tire was changed, the group of four got back in the car, with Quiroz driving, and traveled south. They passed an abandoned building approximately fifteen miles south of Gillette, and decided to stop there. She testified that the body of the victim was left at the community hall. LaVonne testified that both defendant and Lester said, "Hurry up, let's go," after leaving the body. As they pulled away in the car, they left open a gate. A rancher in a pickup forced the car to stop and told them to return and close the gate. LaVonne stated that they went back to the gate, whereupon she and Lester got out and closed it.

The group then drove to Sheridan, Wyoming, stopping at a motel. When Lester and Diane got out to get a room, defendant and LaVonne drove off, leaving them behind. LaVonne testified that while driving toward Billings, Montana, defendant disposed of the blanket which had been in the trunk covering the victim.

8

LaVonne testified that she and defendant stopped at the home of Sylvia Barrigan, where they washed their clothes and washed out the car, including the trunk. She stated that defendant threw a rock away at this location. They then drove to Billings, accompanied by a friend of defendant, Mr. Lyn Ros Bixby. In Billings, on October 18, 1987, the car was stopped by law enforcement officers and defendant was arrested. Lester and Diane hitchhiked to Billings, Montana, where they went to the home of a friend, Lorraine Four Colors. They were apprehended there on October 19, 1987.

On October 19, 1987, law enforcement officers located the body of the victim at the abandoned community hall south of Gillette, Wyoming. An autopsy, performed on October 20, 1987, established that the cause of death was extensive blunt traumatic injuries to the left side of the head, which crushed the victim's skull. Dr. Deters, the pathologist performing the autopsy, testified at trial. He testified that the victim had been injured in the head at least forty-five minutes, and up to twelve hours prior to the fatal assault. This injury had resulted in a subdural hematoma, a collection of blood on the surface of the brain. He testified that the subdural hematoma injury alone was potentially fatal, exclusive of the injuries to the left side of the head.

Defendant was charged with robbery, aggravated kidnapping, and deliberate homicide. His brother, Lester, was charged with the same offenses and his trial was held June 6-24, 1988, in Fallon County, Montana. Defendant's trial began July 26, 1988 in

9

Yellowstone County. On August 6, 1988 the jury returned a verdict finding defendant guilty of robbery, aggravated kidnapping, and deliberate homicide.

The facts will be discussed in greater detail as necessary under each issue. In presenting the issues in this opinion, we have followed the order of occurrence; however, issues XIII, XIV, and XV, are the critical issues relating to the death penalty.

I

Whether the amended information sufficiently informed defendant of the offenses with which he was charged.

On March 24, 1988, defendant moved to dismiss the amended information alleging that it did not sufficiently inform him of the charges against him. The District Court denied this motion. Section 46-11-401(1)(c), MCA, states:

Form of Charge. (1) A charge shall:
. . .

(c) charge the commission of an offense by:
(i) stating the name of the offense;
(ii) citing in customary form the statute, rule, or other provision of law which the defendant is alleged to have violated;
(iii) stating the facts constituting the offense in ordinary and concise language and in such manner as to enable a person of common understanding to know what is intended;
(iv) stating the time and place of the offense as definitely as can be done; and
(v) stating the name of the accused, if known, and, if not known, designating the accused by any name or description by which he can be identified with reasonable certainty.

In the present case the amended information charged the

defendant by name, with robbery in Count I, in violation of § 45-5-401(1)(a), MCA; aggravated kidnapping charged alternatively in Counts II and III, in violation of § 45-5-303(1)(b) and (c), MCA; and deliberate homicide, charged alternatively in Counts IV and V in violation of § 45-5-102(1)(b), MCA. He was charged in each offense as a principal, or by accountability. The information stated that the offenses occurred on or about October 17, 1987, in Custer County, Montana, and in Campbell County, Wyoming, and that the victim was John Martin Etchemendy, Jr. Each offense was alleged in the language of the statute. The amended information was six pages in length and contained details to support the charges.

Simultaneously with the motion for leave to file the information, the State filed a seven-page affidavit containing many factual details of the entire transaction, beginning with the events at the Golden West Bar in Miles City through the death of the victim in Wyoming.

Standards for evaluating the sufficiency of an information include the following:

> The information must reasonably apprise the accused of the charges against him, so that he may have the opportunity to prepare and present his defense. This requirement is satisfied if the charges sufficiently express the language of the statute which defines the offense. (Citations omitted.)

State v. Matson (1987), 227 Mont. 36, 43, 736 P.2d 971, 975.

"The test for the validity of a complaint is whether a

person of common understanding would know what was intended to be charged." State v. Handy (1986), 221 Mont. 365, 368, 719 P.2d 766, 768. Additionally, "the contents of the affidavit supporting a motion for leave to file an information may be considered in determining the meaning of the language contained in the information." State v. Longneck (1981), 196 Mont. 151, 154, 640 P.2d 436, 438. As to a defendant charged by accountability we have stated that "an indictment need not distinguish an act performed by the accused himself and the act of another for which he is legally accountable." State v. Murphy (1977), 174 Mont. 307, 310, 570 P.2d 1103, 1105.

In the present case the information stated the date and location of the alleged offenses and the name of the victim. The crimes were alleged in the language of the statutes. The affidavit filed in support of the motion contained many additional specific details. We conclude the defendant was reasonably apprised of the charges against him, and there is no basis for defendant's contention that the information was insufficient. We affirm the denial of this motion by the District Court.

II

Whether the District Court had jurisdiction over the crimes for which defendant was convicted.

In a pretrial motion to dismiss, defendant contended that Montana lacked jurisdiction to prosecute these offenses. The District Court denied this motion.

12

On appeal, defendant contends that Montana lacks jurisdiction to prosecute these crimes for two reasons. First, he contends that jurisdiction to prosecute the deliberate homicide was properly in the State of Wyoming rather than Montana. Second, defendant contends that federal jurisdiction is exclusive pursuant to the Major Crimes Act, 18 U.S.C. § 1153, because defendant is a full-blooded, enrolled member of the Northern Cheyenne Tribe, and the offenses occurred "within the Indian Country." We will address each jurisdictional issue separately.

The statute governing State jurisdiction for a criminal offense is § 46-2-101, MCA, which provides in pertinent part:

> (1) A person is subject to prosecution in this state for an offense which he commits while either within or outside the state by his own conduct or that of another for which he is legally accountable if:
>     (a) the offense is committed either wholly or partly within the state[.]
>
> \* \* \*
>
> (2) An offense is committed partly within this state if either the conduct which is an element of the offense or the result which is an element occurs within the state.

Pursuant to § 46-2-101, MCA, Montana has jurisdiction if the offense is committed "partly within" the state. This Court has previously construed this statute in State v. White, 230 Mont. 356, 358, 750 P.2d 440, 441, as a "broad assertion of jurisdiction." See also State v. Bush (1981), 195 Mont. 475, 477-78, 636 P.2d 849, 851. Analyzing the elements of

13

each of the three offenses for which defendant was convicted, it is clear that an element of each offense occurred off the reservation, and was committed partly within Montana.

Defendant was charged with and convicted of robbery, described in § 45-5-401(1)(a), MCA, as follows:

> Robbery. (1) A person commits the offense of robbery if in the course of committing a theft he:
>
> (a) inflicts bodily injury upon another[.]

Theft is defined in § 45-6-301, MCA, which provides:

> Theft. (1) A person commits the offense of theft when he purposely or knowingly obtains or exerts unauthorized control over property of the owner and:
> (a) has the purpose of depriving the owner of the property[.]

In the present case Doretta testified that Diane Bull Coming took Mr. Etchemendy's wallet containing credit cards and two employment checks, while Lester inflicted bodily injury upon Mr. Etchemendy. Undisputed testimony demonstrated that this action occurred on the Tongue River Road in Montana, several miles before the group entered the reservation. While the testimony does establish that defendant did not initially take Mr. Etchemendy's wallet from him, the uncontradicted evidence establishes that the defendant exerted unauthorized control over the property of Mr. Etchemendy when he used one of the victim's credit cards to purchase gas at Ashland, which is on the reservation, and at Biddle, which is in Montana and off the reservation. Defendant also shared the proceeds of the

14

checks, and used the stolen credit cards to purchase clothing in Gillette, Wyoming. The testimony also established that defendant inflicted bodily injury upon the victim off the reservation and in Montana.

We conclude that the uncontradicted evidence established that elements of the crime of robbery were committed within the State of Montana and off the Indian Reservation. We affirm the District Court's denial of the motion to dismiss the robbery for lack of state jurisdiction.

Defendant was charged with aggravated kidnapping pursuant to § 45-5-303(1)(b) or (c), MCA, which provides:

> Aggravated kidnapping. (1) A person commits the offense of aggravated kidnapping if he knowingly or purposely and without lawful authority restrains another person by either secreting or holding him in a place of isolation or by using or threatening to use physical force, with any of the following purposes:
>
> * * *
>     (b) to facilitate commission of any felony or flight thereafter;
>     (c) to infict bodily injury on or to terrorize the victim or another;

Again, it is clear that Mr. Etchemendy was restrained within Montana before the group entered the reservation. The physical restraint and robbery of Mr. Etchemendy began in the back seat of the car well before the group entered the reservation. Diane Bull Coming and Doretta Four Bear both testified that shortly thereafter and before entering the reservation, the car stopped and defendant and Lester assaulted the victim outside the car. Then, rather than plac-

15

ing him back in the car, they ordered him to strip, and placed him in the trunk of the car. Boxer shorts, identified at trial as belonging to the victim, were found near Highway 332 in Custer County, Montana, off the reservation. This evidence corroborates the testimony as to where the victim was placed in the trunk. The evidence clearly establishes that elements of the aggravated kidnapping were satisfied in Montana, off the reservation. We affirm the District Court's denial of defendant's motion to dismiss the aggravated kidnapping for lack of state jurisdiction.

Defendant was also charged with and convicted of deliberate homicide under the "felony murder rule." Section 45-5-102(1)(b), MCA, codifies the felony murder rule, providing:

> Deliberate homicide. (1) A person commits the offense of deliberate homicide if:
>
> . . .
>
> (b) he attempts to commit, commits, or is legally accountable for the attempt or commission of robbery, sexual intercourse without consent, arson, burglary, kidnapping, aggravated kidnapping, felonious escape, felony assault, aggravated assault, or any other forcible felony and in the course of the forcible felony or flight thereafter, he or any person legally accountable for the crime causes the death of another human being.

Under the "felony murder rule" it is not necessary to prove the "purposely or knowingly" element of the crime of deliberate homicide. State v. Nichols (1987), 225 Mont. 438, 449-50, 734 P.2d 170, 176-77; State v. Sunday (1980), 187 Mont.

16

292, 307, 609 P.2d 1188, 1197. Rather, the purposely or knowingly element of the underlying felony replaces this element.

In State ex rel. Murphy v. McKinnon (1976), 171 Mont. 120, 556 P.2d 906, we stated that "for the felony murder rule to apply a causal connection between the felonious act and the death must be present." McKinnon, 556 P.2d at 910. Therefore, in the present case the elements the State had to prove were:

1) the commission of the felony
2) that a death occurred
3) a causal connection between the underlying felony and the death.

In the present case, the jury found the underlying felony to be aggravated kidnapping. As previously established, the first element of the deliberate homicide, the commission of the underlying felony of aggravated kidnapping, occurred in Montana. The causal connection element was also satisfied by Montana-based conduct. Only the actual death occurred in Wyoming.

Defendant urges that Montana lacks jurisdiction over the deliberate homicide since the killing occurred in Wyoming. Defendant misconstrues the requirements of the offense of felony murder. The evidence in this case clearly establishes that two elements of the felony murder offense occurred in Montana, bringing this offense within the scope of state jurisdiction pursuant to § 46-2-101, MCA. We affirm the

17

District Court's denial of defendant's motion to dismiss the deliberate homicide based on lack of State jurisdiction.

As a second jurisdictional issue, defendant contends that pursuant to the Major Crimes Act, federal jurisdiction is exclusive. The Major Crimes Act, 18 U.S.C. § 1153(a), provides:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States. (Emphasis added.)

In the present case the critical language of this statute is "within the Indian country." An Indian committing one of the enumerated crimes within Indian country is subject to federal jurisdiction. The issue of State jurisdiction over an Indian defendant is resolved factually in the present case. As previously established, elements of the crimes of robbery, aggravated kidnapping, and deliberate homicide were satisfied within Montana and outside of Indian country.

Defendant contends that if any portion of an offense occurs within Indian country, the State has no jurisdiction. However, this is not the law. The State has jurisdiction for off-reservation offenses even though a connected offense may occur within Indian country. See, e.g., State v. Rossbach

18

(Minn. 1980), 288 N.W.2d 714 (state had jurisdiction where Indian defendant, standing inside reservation, fired rifle across boundary of reservation at a deputy sheriff standing on Minnesota land); State v. Winckler (S.D. 1977), 260 N.W.2d 356 (state had jurisdiction to prosecute seven Indian defendants who fired shots from reservation onto state land). See also 41 Am.Jur.2d Indians § 67 (1968), stating: ". . . Indians are amenable to state laws for offenses against such laws, committed by them off the reservation and within the limits of the state, . . ." While it is true that the victim was taken onto the reservation during the course of the kidnapping, in fact, crossing the reservation three times, this journey through the reservation does not deprive the State of its jurisdiction.

Defendant relies on United States v. Torres (7th Cir. 1984), 733 F.2d 449, cert. denied, 469 U.S. 864, 105 S.Ct. 204, 83 L.Ed.2d 135, (1984), as authority for his contention that federal jurisdiction is exclusive. In Torres, federal jurisdiction attached where the "major portion" of an ongoing conspiracy to "get rid of the victim" occurred on the reservation, even though defendants began to formulate the conspiracy, and abducted the victim outside the reservation. Torres, 733 F.2d at 460. The present case is factually distinguishable from Torres since only a minor portion of the crimes occurred on the reservation. Further, the holding of Torres was that a major portion of a conspiracy occurred on

the reservation, allowing federal jurisdiction. The issue of concurrent state jurisdiction was not decided. Torres does not foreclose state jurisdiction. We conclude that Montana had jurisdiction to prosecute all three charged offenses as required under § 46-2-101, MCA. We affirm the District Court's denial of the motion to dismiss based on lack of jurisdiction.

## III

Whether defendant was denied the right to a speedy trial.

On June 6, 1988, defendant moved to dismiss the charges against him for lack of a speedy trial. This motion was denied by the District Court. On appeal, defendant urges that the delay in his trial was presumptively prejudicial and that he was in fact prejudiced by the delay.

The Sixth Amendment to the United States Constitution provides the basis for defendant's asserted right to a speedy trial. This right is made applicable to the states through the Fourteenth Amendment. State v. Wiman (Mont. 1989), 769 P.2d 1200, 1201, 46 St.Rep. 279, 280. In Barker v. Wingo (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 116-17, the United States Supreme Court articulated four factors to be considered in determining whether a defendant has been denied the right to a speedy trial. These factors are length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. These factors are to be balanced, and each speedy trial case must

20

be approached on an ad hoc basis.  <u>Barker</u>, 514 U.S. at 530.

In <u>Wiman</u> we stated:

> Length of delay is of primary importance.  Unless it is sufficiently long to be deemed presumptively prejudicial to the defendant, there is no need to consider the other factors.  What length will be deemed presumptively prejudicial depends on the facts in each individual case.  State v. Robbins (1985), 218 Mont. 107, 708 P.2d 227, 42 St.Rep. 1440; State v. Worden (1980), 188 Mont. 94, 611 P.2d 185.  There is no need to determine other factors unless there has been some delay which is deemed presumptively prejudicial.  Armstrong, 616 P.2d at 351.

<u>Wiman</u>, 769 P.2d at 1201.

In State v. Worden (1980), 188 Mont. 94, 96-7, 611 P.2d 185, 186, we stated:

> What length will be deemed presumptively prejudicial depends on the facts of each individual case.  A longer delay will be tolerated in a complex case than would be tolerated in one involving a simple fact situation. (Citation omitted.)

In the present case defendant was arrested on October 18, 1987, and trial began on July 25, 1988.  Thus there was a delay of 281 days.  This Court has held comparable delays to be presumptively prejudicial.  <u>See</u> State v. Waters (1987), 228 Mont. 490, 493, 743 P.2d 617, 619 (277 days); State v. Cutner (1984), 214 Mont. 189, 192, 692 P.2d 466, 467 (286 days).  In the present case there is no dispute that defendant asserted this right in a timely manner.  Thus the analysis in the present case focuses on the reasons for delay and the nature of prejudice to defendant.

The events leading up to trial in the present case are

summarized as follows:

On October 23, 1987, the defendant requested recusal of Judge Martin, and on November 9, 1987, Judge Sande was directed to preside. In the interim, on November 2, 1987, the defendant gave notice of his intent to rely upon the defense of mental disease or defect and requested a psychiatric examination pursuant to § 46-14-202, MCA, and commitment for such purpose at a hospital or other suitable facility for a period not to exceed 60 days. His motion was granted on November 23, 1987, and he was ordered transported to the Montana State Hospital at the earliest practicable time. The defendant was hospitalized there between January 7, 1988 and February 13, 1988, and a report containing the evaluation was completed and forwarded to the District Court on February 8, 1988. The defendant himself was accordingly unavailable for trial until early February.

The defendant also requested dismissal of the proceeding on jurisdictional grounds on November 20, 1987. The State responded to that motion on November 27, 1987, and the defendant filed a reply brief six days later. By letter dated February 22, 1988, the county attorney summarized the motions pending in this case and related proceedings against Lester, Diane Bull Coming and Doretta Four Bear and requested their resolution as soon as possible to avoid "a speedy trial problem." He notified counsel for the defendant, Diane Bull Coming and Doretta Four Bear on February 29, 1989, that he and

22

Lester's attorney had agreed to attempt preparation of a stipulated set of facts concerning the jurisdictional question by March 8, 1988, and, if unsuccessful, to have a hearing on that and other motions. A stipulated set of facts was arrived at in Lester's case, and his motion to dismiss on jurisdictional grounds was denied by Judge Obert on April 8, 1988. A hearing on the defendant's corresponding motion in regard to jurisdiction, occurred on June 30, 1988 and was denied during trial at the close of the State's case in chief.

On March 11, 1988, defendant filed a consolidated motion for a change of place of trial, a poll of registered electors and suppression of evidence. At the omnibus hearing on March 24, 1988, defendant filed three other motions. The latter pleadings included a motion to dismiss the amended information for failure to allege sufficiently the nature of the charges, a motion for an award of extraordinary attorney fees, and a motion to compel the grant of testimonial immunity to Lester Kills on Top, Diane Bull Coming, Doretta Four Bear and LaVonne Quiroz pursuant to § 46-15-331, MCA. Defendant filed a brief in support of the venue motion on June 30, 1988. On July 6, 1988, the court conducted a hearing on the suppression motion, and defendant filed a brief in support of that motion on July 8, 1988.

In analyzing speedy trial issues, this Court has stated:

No one factor in the speedy trial analysis is necessary in all circumstances or sufficient alone to determine a deprivation of the speedy trial

right. All factors must be considered together with such other factors as might be relevant. This Court must engage in a difficult and sensitive balancing process. (Citation omitted.)

Worden, 611 P.2d at 187.

This Court has recognized that, "[w]hile it is perfectly acceptable to make numerous motions, it is a simple fact that consideration of motions takes time and may delay a trial." State v. Pease (1987), 227 Mont. 424, 429, 740 P.2d 659, 662. In the present case the defendant filed numerous motions. Further, he delayed five months before filing the bulk of his pretrial motions.

This case was very complex, involving over forty witnesses and 94 exhibits introduced by the State. The trial of defendant's brother, Lester Kills on Top, occurred a month earlier than the trial of defendant and involved the same witnesses and exhibits. Thus trial logistics were complex. However, our review of the record fails to demonstrate any dilatoriness on the part of the State. Although defendant urges that the State delayed his trial in order to plea bargain with accomplices, he fails to show how any delay was caused by plea bargains.

Defendant has likewise failed to demonstrate that he was prejudiced by the delay of his trial. Three factors are considered in determining prejudice, as stated in Barker:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This

> Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

Barker, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.

In the present case defendant has failed to present any facts indicating his defense was impaired. In fact, it may be that the opposite occurred, since defense counsel was able to be present at the trial of Lester, in which virtually the same evidence was admitted. Further, it appears from the record that defendant was actively preparing his defense during the entire delay. Although defendant asserts prejudice resulting from the State's ability to formulate certain plea bargains, this is not the type of prejudice prohibited by Barker. Defendant does not contend that his defense was impaired because he was unable to adequately prepare his case, or because the memories of defense witnesses were impaired. Defendant's failure to demonstrate prejudice supports the conclusion that his right to a speedy trial was not violated. Cf. State v. Shurtliff (1980), 187 Mont. 235, 609 P.2d 303 (defendant's speedy trial right was not violated by 382 day delay where no prejudice was shown and defendant was actively preparing his defense throughout the entire pretrial period); Worden, 611 P.2d at 187 (defendant's speedy trial right was

25

not violated by 319 day delay where defendant demonstrated no prejudice).

In balancing and assessing the facts in light of the Barker factors, we must do so in the context of this case. Many issues were raised by motion in the pretrial proceedings, necessitating briefing and hearings. These motions were seriously made by defendant, opposed carefully by the State, and thoroughly considered by the judges. We are also mindful of the numerous witnesses and exhibits involved in the preparation for trial.

Although we do not attempt to specify the number of days of delay attributable to each party, it is apparent that the delay is attributable in part to the State because of the necessity of adequate prosecution, in part to defendant who made many motions and requests, and in part to the court in considering the multitude of issues. It appears that the State diligently worked to bring this case to trial. Moreover, defendant has shown no prejudice. We conclude that the delay of 281 days, viewed against the complexity of the case and the relevant factors, did not deny defendant the right to a speedy trial. We affirm the District Court's denial of defendant's motion to dismiss based on lack of speedy trial.

IV

Whether the District Court abused its discretion by denying defendant's motion to compel pretrial depositions of

defendant's accomplices.

On March 30, 1988, defendant filed a motion requesting that the District Court grant immunity to Lester Kills on Top, Diane Bull Coming, Doretta Four Bear, and LaVonne Quiroz, and to grant an order compelling their testimony by deposition for use at defendant's trial. The District Court did not rule on this motion. On appeal, defendant claims he was denied effective discovery of possible exculpatory information relevant to his guilt.

The District Court may compel testimony or production of evidence pursuant to § 46-15-331, MCA, which provides:

> Compelling testimony or production of evidence--immunity. Before or during trial in any judicial proceeding, a justice of the supreme court or judge of the district court, upon request by the attorney prosecuting or counsel for the defense, may require a person to answer any question or produce any evidence that may incriminate him. If a person is required to give testimony or produce evidence in accordance with this section in any investigation or proceeding, no compelled testimony or evidence or any information directly or indirectly derived from such testimony or evidence may be used against the witness in any criminal prosecution. Nothing in this section prohibits a prosecutor from granting immunity from prosecution for or on account of any transaction, matter, or thing concerning which a witness is compelled to testify if the prosecutor determines, in his sole discretion, that the ends of justice would be served thereby. Immunity may not extend to prosecution or punishment for false statements given in any testimony required under this section.

The statute provides that the District Court "may" compel testimony or production of evidence; thus an order pursuant to this statute is discretionary with the court. Montana

27

statutes do not specifically authorize pretrial discovery depositions in criminal cases, in line with most jurisdictions. The rationale is that the prior recorded statements of prosecution witnesses afford an alternative discovery source. LaFave, W. and Israel, J, Criminal Procedure § 19.3 (1985). In the present case, the accomplices gave multiple statements to various people, including both state and federal law enforcement officers. The State made all of these statements available to defendant. The trial of Lester Kills on Top occurred one month prior to defendant's trial, and defense counsel had the opportunity to attend that trial and hear the testimony of these accomplices. At District Court, and on appeal, defendant has failed to identify any information which he hoped to elicit, which was not available through prior statements by the accomplices. Defendant has failed to show any prejudice from the District Court's failure to grant his motion. We conclude that defendant has presented no basis for this alleged error, and that the District Court did not abuse its discretion in not allowing pretrial depositions of accomplices.

V

Whether defendant was prejudiced by an order of the District Court in the companion case of Lester Kills on Top.

In the case involving defendant's brother, Lester Kills on Top, the District Court ordered, over objection by Lester Kills on Top, production of statements made by individuals

28

whom Lester intended to call as witnesses at trial. This order was made pursuant to § 46-15-323(4), MCA. Defendant made no objection to this order at District Court. On appeal, he claims he was prejudiced by this order.

Defendant's contention fails on two bases. Pursuant to an order by the District Court in his own case, defendant was required to produce the same information produced in Lester's case. Defendant did not object to the order in his own case and is therefore precluded from raising the issue on appeal. Section 46-20-104(2), § 46-20-701(2), MCA. Further, defendant lacks standing to assert the privilege which was alleged by his brother. 98 C.J.S. Witnesses § 451 (1957); Cf. State v. Gonzales (1988), 231 Mont. 242, 751 P.2d 1063, (defendant lacked standing to object to use of evidence allegedly seized unconstitutionally from his brother's car and residence). Finally, defendant has failed to demonstrate any prejudice to him as a result of the order in Lester's case. We conclude there is no merit to defendant's contention regarding this order.

## VI

Did the District Court err in denying defendant's motion to suppress?

Defendant moved to exclude from his trial all evidence seized from defendant at the time of his arrest, alleging an illegal arrest and an illegal search of his person. The evidence he sought to suppress was the driver's license of

the victim found in defendant's pocket, the clothes he was wearing at the time of his arrest, and a statement made to special agents of the Federal Bureau of Investigation. The District Court held a hearing on this motion on July 6, 1988, and denied the motion on July 19, 1988.

The evidence at the hearing on the motion included testimony by Yellowstone County law enforcement. In substance, this testimony revealed that at a briefing on the afternoon of October 18, 1987, Yellowstone County law enforcement officers were informed that a black Dodge automobile with a certain Montana license plate number and occupied by two male and two female Native Americans had possibly been involved in an assault and kidnapping and that the victim might still be in the vehicle. This information was based upon bulletins from the Miles City Police Department.

That same afternoon, one of the officers observed the vehicle in Billings. He and two other officers stopped the vehicle. At the hearing Officer Dostel testified that this was considered a "felony stop" and the officers approached the car with weapons drawn. (See § 46-5-402, MCA). The vehicle's occupants were ordered out of the vehicle at gunpoint, one at a time. Each person was then frisked for weapons. The individuals were told that they would be detained no longer than thirty minutes and that they would either be arrested or released. Officer Dostel also testi-

fied that he was attempting to identify the car's occupants. As he was frisking the defendant he felt a small square hard object in defendant's pocket, which he removed, hoping that it would provide identification. The object was the victim's driver's license.

The driver of the car, Mr. Lyn Ros Bixby, signed a consent to search form and the automobile was then searched, whereupon the officers discovered blood in the trunk of the car. The officers testified that during this time they were receiving additional messages from the dispatcher in regard to the vehicle and its occupants. The occupants of the car were arrested and were read their Miranda rights.

On appeal defendant contends the officers lacked probable cause to arrest him. He contends he was illegally arrested and therefore the search of his person was also illegal.

A law enforcement officer may make a vehicular stop if the officer has a "reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony[.]". United States v. Hensley (1985), 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604, 612; State v. Gopher (Mont. 1981), 631 P.2d 293, 38 St.Rep. 1078; § 46-5-401, MCA. Further, this suspicion may be based on information obtained from a flyer or bulletin if the bulletin is issued on the basis of articulable facts supporting a reasonable suspicion.

Hensley, 469 U.S. at 235. In the present case the bulletin was issued based on an articulable and reasonable suspicion, and provided a reasonable and articulable suspicion for the Yellowstone County officers. The vehicular stop based upon this information, and the procedures employed by the officers were eminently reasonable under the circumstances.

A peace officer may frisk an individual for weapons incident to making an investigatory stop. Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Additionally, pursuant to § 46-5-402(1)(a), MCA, the officer may "take other reasonably necessary steps for protection if he has reasonable cause to suspect that the person is armed and presently dangerous to him or another person present[.]" A peace officer may arrest a person when he believes on reasonable grounds that the person is committing an offense or that the person has committed an offense and the existing circumstances require his immediate arrest. Section 46-6-401(d), MCA. See State v. Hammer (1988), 233 Mont. 101, 759 P.2d 979; State v. Lee (1988), 232 Mont. 105, 754 P.2d 512; State v. Davis (1980), 190 Mont. 285, 620 P.2d 1209. In the present case the vehicle search was being conducted at essentially the same time as the frisking. The information from the bulletin combined with the discovery of the blood in the trunk constituted probable cause to arrest. A search of the person may be conducted as incident to an arrest. Section 46-5-101(1), MCA. Thus, there is no merit to defendant's con-

32

tention that he was illegally arrested or illegally searched.

At the hearing on the motion to suppress, Officer Best testified that after defendant was arrested, he was advised of his Miranda rights. Defendant signed a waiver of these rights. After his arrest, defendant was taken to Yellowstone County Detention Center where Mr. Traeger, a special agent of the Federal Bureau of Investigation interviewed him. Another special agent, Mr. Leavitt, took notes of the interview, which were later transcribed. During this interview defendant indicated that he remembered a fight in Miles City, Montana, that he remembered being in Ashland, Montana and that the group was also in Sheridan, Wyoming. The transcribed statement indicates that at some point in the interview defendant indicated that he did not want to give further information since he did not want to involve his little brother, Lester.

On appeal defendant urges that any statements made after he expressed his unwillingness to divulge further information were not voluntary. Defendant's statement was not introduced into evidence during the State's case in chief. Defendant contends, however, that any evidence obtained as a result of his statements informing officials of the group's itinerary must be suppressed. Alternatively, defendant contends that the District Court should have held a hearing to determine which evidence was obtained as a result of the confession, and which evidence had an independent source.

In our analysis we begin by recognizing that Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, held that an individual subjected to custodial interrogation must be notified of his right of silence. In interpreting Miranda, the United States Supreme Court, in Michigan v. Mosley (1975), 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, stated:

> A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . ." 384 U.S. at 479. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." Id., at 474. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his "right to cut off questioning" was "scrupulously honored."

Mosley, 423 U.S. at 103-04, 96 S.Ct. at 326, 46 L.Ed.2d at 321.

At the hearing on the motion to suppress, both of the special agents who interviewed defendant testified that any statements made by defendant after he expressed an unwillingness to talk were voluntary. Each officer testified that defendant continued to talk after questioning ceased and that any questions by the officers were only for clarification.

34

Moreover, evidence discovered by means independent of a constitutional violation may be admissible. Nix v. Williams (1984), 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377. This is based on the rationale that the prosecution should not be placed in a _worse_ position than it would be in if no police error or misconduct had occurred. (Emphasis in original.) Nix, 467 U.S. at 443. In the present case, defendant points to no evidence which did not have an independent source. The statement given to the special agents provided a very skeletal outline of the group's itinerary. The evidence obtained by the State came from many other sources, including searches by search and rescue units, and statements of the accomplices. We conclude the District Court did not err in failing to conduct a hearing on the issue, or in refusing to suppress evidence based on this alleged constitutional violation. We affirm the denial of the motion to suppress.

VII

Whether the District Court erred in admitting certain evidence at trial.

Defendant contends that certain trial evidence was improperly admitted. Defendant challenges the admission of various exhibits including the tool box; the pipe; photographs of the pipe, and an associated residue swab; the vice-grip; photographs of the victim's body; items of defendant's clothing; beer cans; .22 shells; and several purchase receipts for food and clothing. Defendant bases these alleged errors

35

on arguments of relevance and prejudice.

Evidence must be relevant to be entered at trial, and a district court has broad discretion in determining relevance. State v. Oman (1985), 218 Mont. 260, 264, 707 P.2d 1117, 1119. Relevance is defined in Rule 401, M.R.Evid., as follows:

> Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant.

In Oman, we discussed relevance as follows:

> The test of relevance is whether an item of evidence will have any value, as determined by logic and experience, in proving the proposition for which it is offered. Generally, whatever naturally and logically tends to establish a fact in issue is relevant, and that which fails to qualify in this respect is not relevant. (Citation omitted.)

Oman, 707 P.2d at 1119.

In the present case the State relied on accomplice testimony, which must be corroborated pursuant to § 46-16-213, MCA. In substance, this statute provides that accomplice testimony cannot sustain a conviction unless it is independently corroborated by other evidence which tends to connect the defendant to the crime. Having reviewed the evidence presented at trial, we conclude that the items of evidence to which defendant now objects were relevant in that each item independently corroborated the testimony of one of the accomplices.

Defendant contends that the admission of the tool box was irrelevant and was prejudicial as evidence of another crime. The tool box was relevant however, as corroborating the testimony of Doretta Four Bear regarding the sequence of events in Ashland and Rabbit Town. Additionally, the State was entitled to introduce the tool box even though it disclosed a crime other than the crimes charged, since it was a part of the corpus delicti and was inextricably related to the entire transaction. State v. Riley (1982), 199 Mont. 413, 425-26, 649 P.2d 1273, 1279.

Defendant objects to two photographs introduced by the State. One photograph, taken on October 19, 1987 at the abandoned community hall, shows the right side of the victim's head and his right shoulder. This photograph corroborated testimony about where the body was left, and was also corroborative of testimony that the victim had been beaten severely prior to receiving the final blows to the head. The second photograph was taken at the autopsy and shows the left side of the victim's head, the side sustaining the fatal blows in Wyoming. The photograph also showed the cut inflicted upon the victim's neck. This photograph was relevant to corroborate testimony about the type and extent of the victim's injuries. The pathologist who performed the autopsy testified at trial. He stated that the autopsy photograph was necessary to depict the severity and location of certain injuries.

We have previously held that if relevant, the inflammatory nature of a photograph of the victim does not necessarily outweigh the probative value. State v. Siglar (1984), 210 Mont. 248, 256, 688 P.2d 749, 753 (holding that the jury was entitled to know the nature and extent of the injuries and no method other than the photographs would demonstrate this as graphically or as well); Riley, 649 P.2d at 1280-81 (holding that photos of victim's appearance at autopsy were reasonably necessary to depict the multiplicity and extent of injuries). We conclude the photographs were relevant and not unduly inflammatory.

## VIII

Whether accomplice testimony was sufficiently corroborated.

Accomplices Lester Kills on Top, Diane Bull Coming, Lavonne Quiroz and Doretta Four Bear testified at defendant's trial. Defendant claims their testimony was not sufficiently corroborated.

Section 46-16-213, MCA, provides that accomplice testimony must be corroborated:

> Testimony of person legally accountable. A conviction cannot be had on the testimony of one responsible or legally accountable for the same offense, as defined in 45-2-301, unless the testimony is corroborated by other evidence which in itself and without the aid of the testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

38

In State v. Kemp (1979), 182 Mont. 383, 597 P.2d 96, we stated some general rules about the "quantum and character of proof required to corroborate accomplice testimony":

> To be sufficient, corroborating evidence must show more than that a crime was in fact committed or the circumstances of its commission. State v. Keckonen (1938), 107 Mont. 253, 263, 84 P.2d 341, 345. It must raise more than a suspicion of the defendant's involvement in, or opportunity to commit, the crime charged. State v. Gangner (1957), 130 Mont. 533, 535, 305 P.2d 338, 339. But corroborative evidence need not be sufficient, by itself, to support a defendant's conviction or even to make out a prima facie case against him. State v. Ritz (1922), 65 Mont. 180, 186, 211 P.2d 298, 300; State v. Stevenson (1902), 16 Mont. 332, 334, 67 P. 1001, 1002. Corroborating evidence may be circumstantial (State v. Harmon (1959), 135 Mont. 227, 233, 340 P.2d 128, 131) and can come from the defendant or his witnesses. State v. Phillips (1953), 127 Mont. 381, 387, 264 P.2d 1009, 1012.
>
> . . .
>
> One accomplice cannot supply the independent evidence necessary to corroborate another accomplice.

Kemp, 597 P.2d at 99.

In the present case a wealth of evidence was presented at trial in corroboration of accomplice testimony, including testimony by nonaccomplice witnesses, and physical and documentary evidence. In fact, in this case there existed an exceptional amount of corroborating evidence, which we will set out in detail.

Testimony received at trial included: 1) the testimony by the victim's friend, Steven Hathaway, establishing that they arrived at the Golden West Lounge near midnight and that

39

Hathaway left without the victim when the bar closed; 2) the testimony of Janelle Eads, a waitress at the lounge, establishing that Diane Bull Coming and the others were there until closing; 3) the testimony of Georgia Graham, an Ashland resident, establishing that a red tool box, which she identified at trial, was discovered missing from her home on October 17; 4) the testimony of a liquor store clerk and a bartender from Broadus establishing that the defendant's group was in that town on the morning of October 17; 5) the testimony of a convenience store clerk in Biddle establishing that the defendant and his group were in that town on the morning of October 17; 6) the testimony of a service station attendant in Weston establishing that the defendant and his group were in that town on the morning of October 17; 7) the testimony of bartenders and clothing store employees establishing that the defendant and his group were in Gillette from early to late afternoon on October 17 and closely corresponding to Diane Bull Coming's and LaVonne Quiroz's descriptions of what occurred in the Lobby Bar, Lipman's Clothing, Corral West Ranch Wear, and the Rustic Inn Lounge; 8) the testimony of the woman who pulled over to allow Lester Kills on Top and Diane Bull Coming to pass on Pickerel Ranch Road; 9) the testimony of a Gillette taxi company representative concerning the defendant and LaVonne Quiroz's ride from the Lobby Bar to the Rustic Inn Lounge; 10) the testimony of the rancher residing near the abandoned community

hall concerning the defendant's presence there, the failure to close the fence gate, the ensuing pursuit and stop, and the defendant's return to the hall where Lester Kills on Top and LaVonne Quiroz shut the gate; 11) the testimony of the Sheridan Super 8 Motel clerk, the Woolworth employee and the Corral West Ranch Wear employee concerning Lester and Diane Bull Coming's activities in that town on October 17 and October 18; and 12) the testimony of Sylvia Barrigan concerning the activities of the defendant and LaVonne Quiroz at her home in Busby on the morning of October 18.

Additionally, Dr. Deters, the pathologist who performed the autopsy, testified at trial. He testified that the victim had a subdural hematoma, which is a collection of blood between the surface and the fibrous tissue of the brain. He said that the victim had a collection of twenty milliliters of blood, which is potentially fatal. The subdural hematoma was located on the right side of the head. The injuries causing the hematoma occurred within the State of Montana and were corroborated by the photograph described in the previous part, which showed the severe beating which had occurred to the right side of the victim's head. Dr. Deters testified that this hematoma resulted from beatings at least forty-five minutes and up to twelve hours prior to death.

Dr. Deters testified that there was a cluster of five injuries to the left side of the victim's head, which crushed the skull and caused injury incompatible with life. He

41

testified that these were delivered at the same time and with the same instrument. He testified that these injuries were consistent with a weapon such as a rock. Dr. Deters testified that the victim had other injuries to the head, caused by a round instrument such as a pipe. This testimony by Dr. Deters corroborates accomplice testimony about the first beatings, and also corroborates testimony by Diane Bull Coming about the final beating.

Aside from these witnesses' testimony, there were numerous physical or documentary exhibits which corroborated various aspects of the accomplice testimony: 1) the blood-stained Milwaukee's Best carton with the M & H gas station price listing discovered near Highway 332; 2) the victim's blood-stained shorts discovered near Highway 332; 3) the defendant's and his brother's shirts discovered near the water trough on Highway 332 and bearing traces of blood consistent with the victim's; 4) the Colstrip Garbage Disposal checks, one of which bore Quiroz's fingerprint, negotiated on October 17 in Broadus and Biddle; 5) the receipts for transactions involving use of the victim's credit card in Weston, Gillette and Sheridan; 6) the Rustic Inn Lounge receipts discovered at Four Colors' residence in Billings and bearing a telephone number supplied by the bartender to Bull Coming; 7) the pipe discovered at the location on Pickerel Ranch Road identified by Diane Bull Coming; 8) the rock discovered at the Barrigan residence containing blood and hair residue consistent with

42

the victim's and the shirt left behind there by the defendant and Quiroz containing blood residue consistent with the victim's; 9) the extensive array of evidence in the form of blood stains and hair linking the victim to the trunk of the vehicle; and 10) the vise-grip found in the front seat area of the vehicle and the spent .22 caliber shell discovered in the trunk which had been fired in a "nonconventional" method.

Such testimony and physical or documentary evidence were clearly sufficient, as a matter of law, to satisfy the State's obligation under § 46-16-213, MCA. That statute neither requires corroboration to "extend to every fact to which the accomplice testifies" nor demands that it be sufficient "to support a prima facie case against the defendant." State v. Ungaretti, (Mont. 1989), 779 P.2d 923, 925, 46 St.Rep. 1710, 1713. Taken as a whole, nonaccomplice testimony and the various exhibits provided powerful support for the testimony of Diane Bull Coming, Doretta Four Bear and LaVonne Quiroz and permitted a properly-instructed jury to consider their testimony in its deliberations. We hold the accomplice testimony was sufficiently corroborated.

IX

Whether the District Court erred in instructing the jury.

Defendant contends the District Court erred in giving certain instructions and in failing to give certain instructions offered by defendant. We will address each contention separately.

43

The jury was instructed on the offenses of robbery, aggravated kidnapping, and deliberate homicide pursuant to the felony murder rule. Defendant contends the jury should have been instructed on the lesser included offenses of unlawful restraint and kidnapping. He contends the jury must be instructed on lesser included offenses if there is "some evidence" to support the lesser offense, citing State v. Hamilton (1980), 185 Mont. 522, 605 P.2d 1121, cert denied, 447 U.S. 924 (1980). We have previously stated the test regarding the court's duty to instuct the jury on lesser included offenses, as follows:

> It is a fundamental rule that the defendant is entitled to an instruction on a lesser included offense if the evidence would enable the jury rationally to find him guilty of a lesser offense and to acquit him of the greater. Keeble v. United States (1973), 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844, 847. But this Court has held that the District Court will not be put in error for refusing to instruct as to the lesser included offense, if the evidence is such to show that the defendant is either guilty of the offense charged or entitled to an acquittal. (Citations omitted.)

State v. Kyle (Mont. 1980), 628 P.2d 260, 263, 37 St.Rep. 1447, 1451.

Unlawful restraint is committed when a person "knowingly or purposely and without lawful authority restrains another so as to interfere substantially with his liberty." Section 45-5-301(1), MCA. Kidnapping is committed when unlawful restraint is effected "by either secreting or holding [the victim] in a place of isolation or by using or threatening to use physical force." Section 45-5-302(1), MCA. Defendant was charged with aggravated

44

kidnapping, committed with a purpose to inflict bodily injury or terrorize the victim, or in the alternative, aggravated kidnapping with the purpose to facilitate commission of any felony or flight thereafter. In the present case, defendant was not entitled to an instruction on unlawful restraint unless there was evidence that the victim was not restrained by secreting him or by using force. He would have been entitled to an instruction on kidnapping only if there was evidence that no purpose to inflict bodily injury or terrorize the victim existed. There is no evidence in the record that the restraint of the victim was not accompanied by the use of force. Neither is there evidence of a kidnapping without a purpose of inflicting bodily injury or terrorizing the victim. The evidence would not reasonably support the lesser included offenses. See also State v. Ballenger (1987), 227 Mont. 308, 312, 738 P.2d 1291, 1294 (court properly refused instructions on aggravated assault and felony assault where evidence demonstrated calculated, relentless beatings of child, resulting in child's death); State v. Farrell (1984), 207 Mont. 483, 491, 676 P.2d 168, 172-73 (court properly refused instruction on misdemeanor theft where evidence showed that amounts received by defendant were over $150, and no rational trier of fact could have found defendant guilty of misdemeanor theft); State v. Radi (1978), 176 Mont. 451, 464, 578 P.2d 1169, 1177 (court properly refused instruction on lesser included offense of criminal trespass where no evidence could lead a jury to believe defendant was in building for an innocent purpose). We conclude that defendant was not entitled to an instruction on these

45

lesser included offenses.

Defendant also contends the jury should have been instructed on theft and assault, urging that these are lesser included offenses of robbery and deliberate homicide. Defendant's contention fails since these are not lesser included offenses of the crimes charged.

> The analysis that this Court has consistently applied in determining whether one offense is included within another offense is the test set forth in Blockburger v. United States (1932), 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309. In Blockburger, the Court ruled:
>
> "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304, 52 S.Ct. at 182, 76 L.Ed at 309.
>
> The Blockburger test is codified in section 46-11-502, MCA.
>
> This Court has adopted the approach whereby the analysis is applied to the statutes in question rather than to the facts of the individual case. State v. Ritchson (1981), Mont., [sic] 630 P.2d 234, 237, 38 St.Rep. 1015, 1018.

State v. Wells (1983), 202 Mont. 337, 351, 658 P.2d 381, 388.

The offense of robbery, pursuant to § 45-5-401(1)(a), MCA, does not require the completed act of theft as an element of robbery. The offense of theft requires proof of an additional fact--that the offense was completed. Theft is thus not a lesser included offense of robbery. See State v. Albrecht (Mont. 1990), ___ P.2d ___, 47 St.Rep. 800.

Defendant also contends that the jury should have been

instructed on assault as a lesser included offense of deliberate homicide. This Court has concluded that the underlying felony in a deliberate homicide pursuant to § 45-5-102(1)(b), MCA, is not a lesser included offense of felony murder. State v. Close (1981), 191 Mont. 229, 245-49, 623 P.2d 940, 949-51. The offense of aggravated assault may constitute the underlying felony in a felony murder charge. Since aggravated assault cannot be a lesser included offense under § 45-5-102(1)(b), MCA, neither can assault. We conclude that the District Court did not err in denying defendant's instructions on these offenses.

Defendant contends the jury instruction on accomplice testimony was inadequate in that it did not identify by name the parties who were accomplices and whose testimony should be viewed with distrust. During settlement of instructions, defendant objected to this instruction but did not state the basis of his objection. Further, since the defendant withdrew his own instruction on accomplice testimony, which listed the names of three accomplices, he cannot now complain on appeal. State v. Bretz (1979), 185 Mont. 253, 296, 605 P.2d 974, 998, cert. denied, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979).

However, we have found no requirement that an instruction on accomplice testimony refer by name to the accomplice witnesses. Further, as the given instruction stated, whether a witness is an accomplice within the meaning of the law may

be a factual question for the jury. We conclude the District Court did not err in instructing the jury on accomplice testimony.

The court gave four instructions on accountability to the jury.[1] Defendant concedes these are correct statements of the law, but contends these instructions did not adequately cover accountability. He contends his refused instructions should have been given. The given instructions correctly and adequately informed the jury of accountability principles. See § 45-2-301, MCA; § 45-2-302, MCA; State v. Miller (Mont.

---

[1] Court's Instruction No. 19:
Mere presence at the scene of the crime and knowledge that a crime is being committed are not sufficient to establish that the defendant was involved in the crime. To be responsible, you must find beyond reasonable doubt that the defendant was a participant and not merely a knowing spectator.

Court's Instruction No. 20:
A person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself or that of another and he is legally accountable for such conduct.

Court's Instruction No. 21:
A person is legally accountable for the conduct of another when either before or during the commission of an offense, and with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid, such other person in the planning or commission of the offense.

Court's Instruction No. 22:
A person is not legally accountable for the conduct of another if:
(1) before the commission of the offense, he terminates his effort to promote or facilitate such commission and does one of the following:
(a) wholly deprives his prior efforts of effectiveness in such commission:
(b) otherwise makes proper effort to prevent the commission of the offense.

1988), 757 P.2d 1275, 1283-84, 45 St.Rep. 790, 798-800. We conclude the jury was properly informed on accountability.

The court gave four instructions on flight. On appeal defendant objects to two of these instructions. He objects to Instruction No. 26 which informed the jury that it might consider any testimony tending to show flight by the defendant as tending to prove consciousness of guilt. Defendant contends there was no evidence that defendant attempted to flee. Defendant did not object to this instruction at trial and cannot now claim error. State v. Smith (1986), 220 Mont. 364, 381-82, 715 P.2d 1301, 1311. We conclude, however, that trial evidence provided an adequate factual basis for the giving of a flight instruction. Defendant immediately left the community hall after helping to dispose of the body, he left Lester and Diane Bull Coming in Sheridan without informing them he was leaving, and he attempted to destroy evidence by washing the trunk of the car and throwing away the rock at the Barrigan residence.

Defendant objected to court's Instruction No. 29 which stated:

> The ensuing flight is considered part and parcel of a Robbery until such time as the criminal purpose, including carrying away of the spoils of the crime, is completed.

Although defendant's objection to this instruction at trial was nonspecific, on appeal he urges that the instruction is incorrect in that flight would be deemed to continue indefinitely under this instruction. We first note that this

instruction correctly states the law. State v. Case (1980), 190 Mont. 450, 454-55, 621 P.2d 1066, 1069. In the present case, the trial evidence provided a factual basis to conclude that the criminal purpose of the robbery continued at least through the events in Gillette, Wyoming. Additionally, since defendant was not convicted of felony murder premised on robbery, any error in the giving of this instruction would be harmless.

Finally, defendant contends the court improperly refused his offered instructions on alibi and justifiable use of force. He contends he was entitled to an alibi instruction since he was in a Gillette bar when the homicide occurred. Defendant also claims there was evidence presented indicating his actions against the victim were in self defense.

> The district court has a duty to instruct the jury on every issue or theory having support in the evidence. In determining whether to give an instruction, the inquiry of the court must only be whether any evidence exists in the record to warrant an instruction. State v. Sotelo (1984), 209 Mont. 86, 89, 679 P.2d 779, 781.

State v. DeMers (1988), 234 Mont. 273, 280, 762 P.2d 860, 864.

However, defendant misapplies the availability of an alibi defense. Defendant was convicted of deliberate homicide under the felony murder rule. Defendant was charged as a principal and by accountability. Although defendant was not present at the scene of the homicide, evidence existed to

50

connect him to the offense under the felony murder rule and through accountability principles. His presence at the Gillette bar therefore does not provide a basis for an alibi defense.

As to the justifiable use of force instruction, the State contends there is no factual or rational basis for submitting this issue to the jury, and we agree. In DeMers we listed the necessary findings in regard to a justifiable use of force defense as follows:

> In order to find justifiable use of force the jury must find that the defendant (1) was not the aggressor, (2) reasonably believed that he was in imminent danger of unlawful harm, and (3) that he used reasonable force necessary to defend himself.

DeMers, 762 P.2d at 865. The trial evidence would not support this defense. We conclude the District Court did not err in refusing to give instructions on alibi and justifiable use of force.

We conclude the District Court did not err in instructing the jury.

X

Whether there was prosecutorial misconduct at trial, and if so, whether defendant was thereby prejudiced.

Defendant contends "prosecutorial misconduct" occurred during his trial. He bases this assertion on certain questions asked of Lester by the county attorney on cross-examination.

On cross-examination the county attorney asked Lester if

51

it was true that he and defendant ran after the victim and brought him back to the car at one of the stops. Later in the cross examination the county attorney asked Lester if it was defendant who wanted to go to Ashland, and he also asked Lester if it was defendant who practiced endorsing the checks taken from the victim. At trial defendant objected to each of these questions as having no factual basis in the record. His objections were overruled.

On appeal, defendant characterizes these questions as prosecutorial misconduct. "It is clear that misconduct by a prosecutor may form the basis for granting a new trial where the prosecutor's actions have deprived defendant of a fair and impartial trial." State v. Gray (1983), 207 Mont. 261, 266-67, 673 P.2d 1262, 1265-66. We conclude however, that in the present case the questions by the county attorney did not amount to misconduct, and did not deny defendant a fair and impartial trial.

"It is unprofessional conduct for a prosecutor to ask a question which implies the existence of a factual predicate for which a good faith belief is lacking." ABA Standards for Criminal Justice § 3-5.7(d) (1986). The questions asked by the county attorney were not without a good faith belief that a factual basis existed for these questions. Moreover, these questions were insignificant in view of the total evidence produced at trial. We conclude the court did not err in overruling defendant's objections, and that no

prosecutorial misconduct has been shown.

Defendant also objects on appeal to seven statements made by the prosecution in closing argument. However, no objection was made to these statements at trial. Any claim of prejudicial error has therefore been waived. See §§ 46-20-104(2), 46-20-701(2), MCA; State v. Smith , 232 Mont. 156, 160, 755 P.2d 569, 571. In any event the statements are not significant, especially in view of the total evidence produced at trial. We conclude defendant has shown no prosecutorial misconduct and was not denied a fair and impartial trial.

## XI

Whether the District Court erred in denying defendant's motion for a mistrial.

On the ninth day of trial, defense counsel made a motion for a mistrial because the bailiff and a deputy clerk were wearing badges which stated, "Take a Bite out of Crime." The District Court denied this motion but asked the court personnel to remove the badges. On appeal defendant contends the court should have granted a mistrial.

A mistrial is an extreme remedy only to be granted for "manifest necessity" and as required by the "ends of public justice." State v. Brush (1987), 228 Mont. 247, 252-53, 741 P.2d 1333, 1336. A motion for a mistrial is directed to the sound discretion of the trial court. The appellate court determines if the trial court abused its discretion in denying a mistrial. Brush, 741 P.2d at 1336.

In the present case defendant has made no showing of prejudice and has demonstrated no basis for a mistrial. Although this Court expressly disapproves of such conduct, from the transcript it is apparent that the district court did not consider the situation serious. The jury was instructed to decide the case based on the evidence presented at trial. In view of the overwhelming evidence pointing to defendant's guilt, we conclude that beyond a reasonable doubt these badges were not significant and did not contribute to the verdict. Brush, 741 P.2d at 1336. We conclude the District Court properly denied defendant's motion. We affirm the District Court's denial of the motion for a mistrial.

XII

Whether the District Court abused its discretion by utilizing the verdict form offered by the State.

The court utilized the verdict form offered by the State. This verdict form listed the five counts as charged in the amended information. The form indicated that Counts II and III, both dealing with aggravated kidnapping, were alternative findings. Similarly Counts IV and V, dealing with deliberate homicide, were listed alternatively. Defendant contends this form was confusing to the jury.

The county attorney carefully explained the verdict form to the jury during closing argument, and Instruction No. 38 also explained the form. The form was consistent with the amended information and clearly framed. We see no merit to

54

defendant's contention. We conclude the District Court did not err in submitting the State's verdict form to the jury.

## XIII

Whether certain factual findings in the District Court's sentencing order were supported by substantial evidence.

Defendant challenges ten of the findings of fact in the sentencing order as not supported by the evidence. The challenged findings are:

> 11. That the victim suffered a subdural hematoma, as a result of the beatings in Custer County, Montana prior to the final beatings which led to his death in Campbell County, Wyoming.
>
> . . .
>
> 14. That the Defendant knew that the victim was married and had a family.
> 15. That the victim pleaded with this Defendant and his accomplices, for his life, to no avail. The victim was killed by Lester Kills On Top who beat the victim on the head with a tire iron, pipe and rock, cut the victim's throat with a small knife and shot at him with a .22 shell held in a vice grip.
>
> . . .
>
> 17. That since the Defendant did not testify at the trial or at the sentencing hearing, the Court has not heard anything from the Defendant. By his demeanor in Court at the trial and sentencing hearing, he has exhibited no remorse.
>
> . . .
>
> 20. That the Defendant could have removed himself from the entire episode and could have saved the life of the victim on more than one occasion, when he was left alone with the victim, but failed to do so. That the actions of this Defendant were so depraved as to reach a conclusion that any leniency would be an injustice.
> 21. That two of the aggravating circumstances

55

set forth in §46-18-303 of the Montana Code Annotated apply in this case:

A. The offense was Deliberate Homicide and was committed by means of torture.

B. The offense was Aggravated Kidnapping which resulted in the death of the victim.

22. The only possible mitigating circumstance that appears pursuant to §46-18-304 of the Montana Code Annotated is that the Defendant has no significant history of prior criminal activity. In that regard, the Defendant, although he has no prior felony record, does have a substantial record of violent offenses on the Northern Cheyenne Indian Reservation including Assault and Assault and Battery, occurring over a period of several years.

23. The mitigating circumstances that the Defendant acted under the substantial domination of another person does not apply in that it appears that this Defendant assisted in the decision to "roll" the victim initially and was driving the car which he turned around and away from Miles City. Further, on several occasions, the Defendant did have the opportunity to remove himself from the entire depraved scheme and to save the life of the victim. There is no evidence that the Defendant was dominated by anyone.

24. The Defendant had been drinking, but there is no evidence to support quantitatively how much the Defendant had consumed or his condition. Furthermore, it appears that the Defendant acted rationally although in a depraved manner, by driving the car, washing the blood off his hands, disposing of his bloody shirt, using the gas credit card of the victim in Ashland and in advising Lavonne Quiroz to move the car from the street in Gillette to an alley location where the victim could not be heard calling for help. Clearly, he had the ability to make decisions and the fact that he was drinking is no defense to the crimes committed as the intoxicants were voluntarily taken by the Defendant. Nor is there any evidence before the Court to show that the Defendant was substantially impaired by the drinking.

25. That the Defendant was an accomplice in the Deliberate Homicide committed by another person. He was a direct participant in the Aggravated Kidnapping and Robbery and, further, his participation was not minor, but was substantial, in that he assisted in the planning of the abduction and robbery, assisted in the beatings and choking of the victim, helped strip and place the victim in the trunk, and used the proceeds of the robbery.

He agreed that the victim had to die; and when he could have assisted the victim, told Lavonne Quiroz to move the car to the alley when the victim began making noise and pleading for help. He also assisted at the time the body was concealed. The only portion of the crime for which the Defendant had no involvement was the period of time when the victim was finally beaten and killed by Lester Kills On Top.

In regard to finding number 11, Dr. Robert Deters, who conducted the victim's autopsy, testified at trial. He stated there was a subdural hematoma on the right side of the head caused by a series of insults to the head. He testified that the hematoma must have occurred at least 45 minutes and up to twelve hours prior to the injuries to the left side of the head. The only beatings Mr. Etchemendy received prior to being placed in the trunk occurred in Custer County. No testimony indicates that he was beaten again prior to the fatal blows. We conclude that finding number 11 is supported by substantial evidence.

As to findings number 14 and 15, Diane Bull Coming testified that while the victim was in the trunk he stated that he was married and had two children. Defendant was in the car at that time. She also testified that Lester beat the victim with a tire iron, pipe, and rock, attempted to shoot the victim by use of a vice grip, and that Lester attempted to cut the victim's throat with a knife. Photographs and physical evidence corroborated this testimony. There was testimony at trial that the victim pleaded with defendant and Lester to stop beating him while outside the car

in Custer County, that defendant pleaded through the back seat of the car while he was in the trunk as the group was traveling to Gillette, and that the victim pleaded for help and pounded on the trunk while the car was stopped in Gillette. The finding by the sentencing court that the victim pleaded with defendant for his life is supported by the evidence. We conclude that findings of fact numbers 14 and 15 are supported by substantial evidence.

In finding number 17 the court noted that defendant exhibited no remorse at trial. At the sentencing hearing two ministers testified that defendant was remorseful. The finding by the District Court is a proper response to this testimony.

The court's finding of fact number 20, that defendant could have removed himself from the entire episode and could have saved the life of the victim on more than one occasion when he was left alone with him but failed to do so, and also that the actions were so depraved that leniency would be an injustice, are supported by substantial evidence. The testimony demonstrated that defendant was left alone with the keys to the car on more than one occasion, and that there were a number of opportunities where he could have saved the life of the victim had he chosen to do so. Our careful review of the extensive evidence demonstrates that the conclusion that the defendant was so depraved that leniency would be an injustice is an appropriate conclusion. We conclude finding

number 20 is supported by substantial evidence.

With regard to finding number 21, the defendant contends that the court's finding that the offense of deliberate homicide was committed by means of torture is not supported by the evidence. The fatal blows in Wyoming were brutally accomplished by use of a pipe, a tire iron and a rock. Diane Bull Coming testified that during this beating the victim cried out, "Oh God, no, God, no," while blood spurted from his head. Additionally, we cannot rationally separate the final beating from the entire criminal transaction which demonstrated a course of conduct involving brutality and extending over a number of hours. Prior to delivery of the fatal blows in Wyoming the victim was brutally assaulted several times and confined nude in the small trunk of a car on a cool morning for a number of hours. The evidence established that these prior beatings in Montana were severe enough to be potentially fatal. Dr. Deters testified that the subdural hematoma was potentially fatal. It is not possible to determine from the medical evidence the extent to which the prior beatings contributed to the victim's death. The beatings and restraint, culminating in the bludgeoning to death of the victim, constitute substantial evidence that the homicide was committed by means of torture.

The determination that these acts were torturous is consistent with this Court's previous holdings regarding torture in death penalty cases. See, e.g., State v. Dawson,

59

233 Mont. 345, 358, 761 P.2d 352, 360, cert. denied, ___ U.S. ___, 109 S.Ct. 3200, 105 L.Ed.2d 708, (1989); (evidence supported finding that deliberate homicide was committed by means of torture where victims were bound and gagged in each others' presence, injected with unknown drugs, and strangled); State v. McKenzie (1976), 171 Mont. 278, 296, 557 P.2d 1023, 1034, vacated, 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977), on remand, 177 Mont. 280, 316, 581 P.2d 1205, 1226 (1978), cert. denied, 443 U.S. 912, 99 S.Ct. 3103, 61 L.Ed.2d 877 (1979), on remand, 186 Mont. 481, 513, 608 P.2d 428, 447-48 (1980), cert. denied, 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507, (1980) (evidence supported finding that deliberate homicide was committed by means of torture where victim was killed by a blow which laid open her head, prior to which she was nonfatally strangled); State v. Lester Kills on Top (Mont. 1990), 787 P.2d 336, 348-49, 47 St.Rep. 366, 382 (evidence supported finding that deliberate homicide was committed by means of torture where severely beaten victim was placed nude in trunk of car, restrained there for twelve hours, then bludgeoned to death with a pipe, tire iron, and rock). We conclude that there exists substantial evidence to support a finding that defendant caused the victim's death by torture. The sentencing court also found as an aggravating circumstance, that the offense was aggravated kidnapping which resulted in the death of the victim. Defendant was convicted by jury of aggravated kidnapping with the purpose to

facilitate commission of any felony or flight thereafter, pursuant to § 45-5-303(1)(b), MCA. Substantial trial evidence supports this conviction. The testimony established that defendant restrained the victim with physical force, and by helping to place him in the trunk. At the same time defendant participated in the robbery of the victim. The aggravated kidnapping resulted in the death of the victim. We do note here although defendant contends that there was no causal connection between the aggravated kidnapping and the death, there is no merit to this contention. The kidnapping continued up to the point of death, and defendant did nothing to terminate it. We conclude that finding number 21 is supported by substantial evidence. We affirm the sentencing court's findings on this issue.

As to finding number 22, at the presentence hearing evidence was presented that defendant had a record of assault-related and alcohol-related offenses on the reservation. Defendant contends the finding by the sentencing court that he had a substantial record of violent offenses is incorrect since some of these offenses may have been committed by his father but mistakenly attributed to defendant. Testimony at the hearing clarified which charges were attributed to defendant, and which charges had been dismissed. The presentence report and hearing testimony support the finding by the sentencing court as to defendant's prior offenses as contained in finding number 22.

The court's finding in No. 23, that defendant was not dominated by anyone, is supported by much evidence demonstrating his personal involvement in the offenses. Additionally, the court's finding No. 24, that defendant's consumption of alcohol did not impair his ability to act rationally, is supported by substantial evidence. The instances of defendant's rational behavior, enumerated by the court, are supported by the evidence.

Finding of Fact No. 25 states that defendant was an accomplice to the homicide and that his participation in the aggravated kidnapping and robbery was substantial. The court's listing of defendant's specific involvements is supported by testimony from Doretta, Diane, and LaVonne. Further, many exhibits corroborated defendant's involvement, including his shirt with blood on it, found near the water trough; receipts for clothes and gas, signed by defendant; and the clothes he left at the Barrigan's, which contained blood. At trial Diane Bull Coming testified that on two separate occasions defendant agreed with Lester that the victim had to die. Although defendant complains that this particular testimony, made by an accomplice, was not corroborated, corroboration of every fact is not necessary. "Where an accomplice has been corroborated as to part of his testimony and that testimony has been accepted as truthful, it is proper for the court to infer the accomplice spoke the truth as to all his testimony." State v. Coleman (1979), 185

Mont. 199, 332, 605 P.2d 1000, 1020, cert. denied, 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980), rev'd on other grounds, 874 F.2d 1280 (9th Cir. 1989). See also, 23 C.J.S. Criminal Law § 1015 (1989). We conclude that the above findings are supported by substantial evidence.

## XIV

Whether imposition of the death penalty is constitutional under the mandatory review criteria of § 46-18-310, MCA.

On appeal, defendant also challenges the constitutionality of Montana's sentencing statutes which govern imposition of the death penalty. Defendant relies on a recent Ninth Circuit case, Adamson v. Ricketts (9th Cir. 1988), 865 F.2d 1011, petition for cert. filed, 57 U.S.L.W. 3739 (U.S. March 20, 1989) (No. 88-1553). In Adamson, the Ninth Circuit declared unconstitutional Arizona's sentencing statutes which govern imposition of the death penalty. In comparing Arizona's statutes with those of Montana, we note that they are similar.

Defendant did not raise this specific objection to Montana's sentencing statutes at District Court, and we decline to address this issue on appeal. First, the Adamson decision is not binding on Montana, and we note that the decision has been appealed to the United States Supreme Court. Second, this issue was not raised at District Court and was neither substantively briefed nor argued before this Court. Thus it is not appropriate for this Court to consider the

issue. As a final comment, we note that this Court has previously held these statutes to be constitutional based on similar challenges in Dawson, 761 P.2d at 360, and State v. Smith (1985), 217 Mont. 461, 490-91, 705 P.2d 1087, 1105-06, cert. denied, 474 U.S. 1073, 106 S.Ct. 837, 88 L.Ed.2d 808 (1986).

We conclude that the imposition of the death penalty is constitutional under the review criteria of § 46-18-310, MCA.

XV

Supreme Court sentence review pursuant to § 46-18-310, MCA.

In Montana, appellate review of a death sentence is prompt, § 46-18-308, MCA, and automatic, § 46-18-310, MCA. In reviewing a death sentence pursuant to § 46-18-310, MCA, this Court must determine 1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; 2) whether the evidence supports the court's findings on any mitigating and aggravating circumstances; and 3) whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Defendant does not expressly contend that this sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Defendant does, however, infer that defendant's race of Native American may have been a factor in either the verdict or in sentencing. We therefore discuss

64

this inference. We begin by concluding that nothing in the trial transcript, including the voir dire, provides a basis for allegations of bias based on race. The voir dire was conducted by interviewing prospective jurors in groups of six. Each group was specifically asked if defendant's race would be a factor in decision-making. No juror expressed bias because of race. The answers given in voir dire provide no basis for allegations of racial prejudice. Additionally, our review of the trial transcript provides no suggestion that race was improperly injected into this trial, either by the prosecution or by defense counsel.

In its findings of fact the sentencing court notes defendant's age, the date and place of his birth, and the fact that defendant is a Northern Cheyenne Indian. The sentencing court notes that defendant has a record of violent offenses on the Northern Cheyenne Reservation. These are the only references to defendant's race in the sentencing order. The record is devoid of any indication that race was a factor in sentencing.

We further note that since Montana's death penalty statutes were revised in 1977 to conform to United States Supreme Court holdings in Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, defendant and his brother, Lester Kills on Top, are the only Native Americans to receive the death penalty in Montana. Only one other defendant from a minority race has been sentenced to death and that case involved a black defendant. See Coleman. We conclude that

defendant's inferences that race was a factor in this case are unsubstantiated.

We also choose to discuss the finding made by the sentencing court in finding No. 18:

> 18. That the victim's family has been deprived of a son, a husband and brother, and the parents of the victim have been for some time, and now are, undergoing psychiatric counselling as a result of their son's death.

The United States Supreme Court, in Booth v. Maryland (1987), 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, held that the jury's consideration of a victim impact statement in that case was error, requiring resentencing. In Booth, the State of Maryland had a statute requiring consideration at sentencing of victim impact statements if the victim suffered injury or death. In Booth the sentencing was done by the jury. The defendant was convicted of the murder of an elderly couple. Before sentencing, a lengthy statement written by the Maryland Division of Parole and Probation was read to the jury. It contained statements made by several family members, including a son, daughter, and granddaughter. The statements described the good character and reputation of the victims, and the emotional distress suffered by the various family members. The statement was lengthy and poignant, containing many facts regarding the impact on the family.

The court held that consideration of the statement violated the Eighth Amendment in that it could influence the jury to impose sentence in an arbitrary or capricious manner.

66

The court stated that a victim impact statement is irrelevant, that it improperly diverts the jury's attention away from the defendant and the crime, and that it is inconsistent with the reasoned decision-making required in a capital case. Booth, 482 U.S. at 503-09.

In the present case the record contains no written victim impact statements. The source of the information about the parents' counselling is from the father's testimony at the presentence hearing. At this hearing the father also testified that the victim graduated from Montana College of Mineral Science and Technology with honors, and that he had a wife and two sons. The father stated his opinion that this was an appropriate case for the death penalty.

In two recent Montana cases this Court discussed whether consideration of victim impact statements at sentencing constituted reversible error. In Dawson, the presentence investigation report contained a three paragraph victim impact statement, which stated that three members of a family had died as a result of the homicide, and that the teenage daughter was undergoing counseling but "not doing so well." This Court concluded that Booth was not controlling in that sentencing was by the court, not the jury, and because the victim impact statement was not as lengthy or poignant as the one in Booth. Dawson, 761 P.2d at 361. See also State v. Keith, 231 Mont. 214, 235-37, 754 P.2d 474, 487-88. The present case is distinguishable from Booth in that sentencing

was by a judge rather than a jury, and there was no written victim impact statement. The testimony by the father was neither lengthy nor emotional. It was clearly not as questionable as the information considered in Booth. We conclude there was no error in the sentencing court's consideration of the statements.

The findings of the sentencing court are lengthy and dispassionate and afford no indication that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the sentence was not imposed under passion, prejudice, or any arbitrary factor.

The second determination pursuant to § 46-18-310, MCA, requires this Court to consider whether the evidence supports the sentencing court's findings of aggravating and mitigating circumstances. In Montana, before imposing the sentence of death, the sentencing court must find at least one of the aggravating circumstances of § 46-18-303, MCA. It then determines if any of the specific mitigating circumstances exist, as listed in § 46-18-304, MCA, including "[a]ny other fact that exists in mitigation of the penalty." Section 46-18-304(8), MCA. In determining whether to impose the death penalty the sentencing court must take into account the aggravating and mitigating circumstances to determine if there are mitigating circumstances sufficiently substantial to call for leniency. Section 46-18-305, MCA. Thus our statues provide for sentencing that is guided yet individualized.

In the present case, the court found two aggravating circumstances. It determined that the offense was deliberate homicide committed by means of torture, and also that the offense was aggravated kidnapping which resulted in the death of the victim. In Issue XIII we discussed the court's finding that the deliberate homicide was committed by means of torture, concluding that substantial evidence supports this finding. Likewise, in Issue XIII we discussed the sentencing court's finding that the offense was aggravated kidnapping which resulted in the death of the victim. We concluded that substantial evidence supports this finding. From this previous determination, we conclude that the sentencing court's findings of aggravating circumstances are supported by substantial evidence.

The sentencing court found that the only possible mitigating circumstance was that the defendant had no significant history of prior criminal activity. The court did note that defendant had a substantial record of violent offenses on the Northern Cheyenne Indian Reservation. The court went on to conclude that when compared to the enormity of the offenses committed and circumstances thereof, there were no mitigating circumstances sufficiently substantial to call for leniency. The mitigating circumstance that defendant had no significant history of prior criminal activity, was present in Dawson, wherein this Court affirmed the sentencing court's refusal of leniency in light of the offenses committed. Dawson, 761 P.2d

at 361-62. See also State v. Smith (1985), 217 Mont. 461, 478, 705 P.2d 1087, 1097; Coleman, 605 P.2d at 1019-20. In the present case, in view of the offenses committed, we conclude that the evidence supports the court's finding that there were no mitigating circumstances sufficiently substantial to call for leniency.

In this case the death sentence has been imposed on a defendant convicted of deliberate homicide, notwithstanding that the defendant did not inflict the final fatal blows and was not present at the infliction of such blows. We next address the issue of whether or not the sentence of death is excessive or constitutes cruel and unusual punishment under those circumstances.

The United States Supreme Court addressed a similar issue and upheld the death penalty in the case of two nontriggermen in Tison v. Arizona (1987), 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127. In Tison, two brothers challenged their death sentences, claiming the Enmund rule was not satisfied. In Enmund v. Florida (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, the court held that the death penalty may be imposed on a defendant who killed, attempted to kill, or intended to kill or that lethal force be used.

In Tison, Ricky and Raymond Tison planned and effected the escape of their father from prison by smuggling guns into the prison and helping him and another prisoner escape. Later, when their car had a flat tire, the brothers helped

flag down a car with a family of four. They assisted in the abduction and robbery of the family, then watched while the father and another convict shot all four people. The United States Supreme Court held that imposition of the death penalty upon Ricky and Raymond Tison did not violate the Eighth Amendment. The Court stated, "[W]e simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Tison, 481 U.S. at 158. Thus in the present case, the fact that the defendant did not deliver the final fatal blows does not preclude imposition of the death penalty.

Applying the Tison standard to the present case we begin by noting that the sentencing court, in its findings of fact, stated:

> 25. That the Defendant was an accomplice in the Deliberate Homicide committed by another person. He was a direct participant in the Aggravated Kidnapping and Robbery and, further, his participation was not minor, but was substantial, in that he assisted in the planning of the abduction and robbery, assisted in the beatings and choking of the victim, helped strip and place the victim in the trunk, and used the proceeds of the robbery. He agreed that the victim had to die; and when he could have assisted the victim, told Lavonne Quiroz to move the car to the alley when the victim began making noise and pleading for help. He also assisted at the time the body was concealed. The only portion of the crime for which the Defendant had no involvement was the period of time when the victim was finally beaten and killed by Lester Kills On Top.

Substantial trial evidence supports this finding. We

conclude that the <u>Tison</u> requirement that defendant be a major participant in the felony, was clearly met in the present case.

In <u>Tison</u> the court also determined that the Tison brothers had exhibited a reckless indifference to human life. The specific facts in <u>Tison</u> leading to the determination were as follows:

> 1) Raymond and Ricky Tison brought the lethal weapons into the jail and gave them to two men already convicted of murder;
>
> 2) Raymond acknowledged he had been prepared to kill, if necessary, during the prison escape;
>
> 3) Raymond Tison flagged down the innocent family;
>
> 4) Both brothers robbed the family and guarded them at gunpoint;
>
> 5) They stood by and watched the killing;
>
> 6) They made no effort to assist the victims after the shooting; and
>
> 7) They chose to assist the killers in their continuing criminal acts following the killing.

Comment, <u>Tison v. Arizona: No Intent Required for Death Penalty of Accomplice in Felony Murder,</u> 10 Criminal Justice J. 167, 173-74 (1987).

In the present case, the facts indicating a reckless indifference to human life are:

> 1) Defendant participated in the restraint and beatings of the victim in the car, including choking the victim;
>
> 2) Defendant participated in severe beatings

72

of the victim outside the car, including kicking the victim in the head;

     3) Defendant participated in forcing the victim to strip and get in the trunk;

     4) Defendant did nothing to release or assist the victim during the approximate twelve hour period he was in the trunk, notwithstanding the visibly injured condition of the victim whose face was badly swollen and who was covered with blood;

     5) Defendant directed Quiroz to move the vehicle from the street to an alley in Gillette when the victim was calling for help; and

     6) Defendant helped dispose of the body.

These facts are not only supported by the evidence, but are uncontradicted. These facts alone are sufficient to satisfy the _Tison_ standard of reckless indifference to human life. We emphasize here that neither the felony murder rule, nor the _Tison_ standard, requires a finding of purposely or knowingly in regard to the homicide. Defendant was directly involved in the serious beating of the victim. Testimony established that defendant kicked the victim in the head. The testimony of the pathologist, Dr. Deters, established that the victim had a subdural hematoma, most likely caused by being kicked in the head. He testified that this injury alone was potentially fatal and could have eventually caused the death of the victim, even without the final blows delivered in Wyoming. Defendant engaged in physical brutality so severe that it could have caused death without further infliction of physical violence. Defendant then participated in placing the nude victim in the trunk of the car on a cool October morning,

73

after this severe and potentially fatal beating, and did nothing for the victim for a span of over twelve hours. Later, on two separate occasions, when Lester stated the victim would have to be killed, defendant agreed. Defendant was forewarned and agreed the victim had to die; nevertheless he failed to prevent the death. We hold that in the present case defendant was a major participant in the felony and exhibited a reckless indifference to human life.

In Finding No. 25 the sentencing court found that "[defendant] agreed that the victim had to die." This finding is supported by the record from the testimony of accomplice, Diane Bull Coming. Although the present case is dissimilar to Tison, in that defendant was not physically present at the scene of the killing, we conclude that the finding by the sentencing court as to defendant's assent to the killing, reconfirms his culpability, even though he was absent when the final blows were struck.

Moreover, in comparing the inhumane treatment of Mr. Etchemendy, which extended over a period of twelve hours, and the seriousness of the offenses committed with defendant's direct participation, we conclude that the culpability of defendant far exceeds that of the two brothers in Tison. There is no statement in Tison that the brothers agreed to the killings. In the present case, the court found based on the evidence, that defendant agreed to the killing. Defendant's physical absence during the fatal blows does not diminish the

reckless indifference to human life which he exhibited. We conclude that defendant's culpability is established as required by Tison and Enmund. We hold that in the present case the death penalty does not constitute excessive or cruel and unusual punishment.

Finally, this Court must determine whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendants. Defendant has presented no argument on this, however in accordance with our statutory duty, we have compared the following cases appealed to this Court which involved similar crimes for which the death penalty was or could have been imposed: Dawson; State v. Keefe (1988), 232 Mont 258, 759 P.2d 128; Keith; Smith, 705 P.2d 1087; State v. Fitzpatrick (1980), 186 Mont. 187, 606 P.2d 1343, cert. denied, 449 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d 118 (1980), rev'd on other grounds, 869 F.2d 1247 (9th Cir. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989); Coleman; McKenzie; and Lester Kills on Top. We note that both Fitzpatrick and Coleman were reversed; however, these reversals were on grounds not relevant to our proportionality analysis.

After examination of such factors as the gravity of the offenses, the brutality with which they were committed, and the existence of any factors meriting leniency, we hold that the sentence in the present case is not disproportionate or excessive to others imposed in similar cases. All the above-

cited cases, except <u>Keefe</u>, involved a death penalty imposed for the aggravated kidnapping and subsequent death of a victim. The factor allowing leniency in <u>Keefe</u>, that the defendant was a minor, is not present in this case. Defendant was 29 when the offenses were committed.

The present case involves a course of criminal conduct extending over twelve hours and demonstrating a total lack of compassion for another human being. The homicide was senseless, calculated and brutal.

We have reviewed the entire record in this case in affirming the determinations of the District Court. In applying the <u>Tison</u> standard, this Court independently finds and concludes that Mr. Vern Kills on Top was a major participant in the crimes committed, and that he exhibited a reckless disregard for human life. <u>See</u> Cabana v. Bullock (1986), 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704, overruled in part on other grounds, Pope v. Illinois (1987), 481 U.S. 497, 504, 107 S.Ct. 1918, 1922, 95 L.Ed.2d 439, 447 (stating that defendant's culpability in regard to the <u>Enmund</u> rule need not be made by a jury, but may be made at any point in the state criminal process ).

Accordingly this Court hereby affirms the convictions and the sentences imposed by the District Court. This case is remanded to the District Court which shall set a date for execution in accordance with the statutes.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

Justice John C. Sheehy, dissenting:

I dissent to the imposition of the death penalty in this case as I did in the companion case of State v. Lester Kills On Top, ___ Mont. ___, 787 P.2d 336, 355 (1990), upon the grounds that the death penalty is cruel and unusual punishment and so prohibited by the Eighth Amendment of the United States Constitution, the Due Process Clause of the Fourteenth Amendment to that Constitution and Art. II, § 22 of the Montana Constitution.

Montana is a "weighing state" in that the District Court, in determining whether to impose a death sentence, must find aggravating circumstances related to the death described in § 46-18-303, MCA, and weigh against any one or more of those aggravating circumstances the mitigating circumstances described in § 46-18-304, MCA. Even if no appeal is taken by a defendant, the judgment of conviction and sentence of death are subject to automatic review by this Supreme Court under § 46-18-307, -308, -309, and -310, MCA. Particularly, in § 46-18-310, this Court is given the authority when a death sentence has been imposed by the District Court to determine "whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating and mitigating circumstances enumerated in § 46-18-303 and § 46-18-304." There is no provision in our statutes giving this Court the authority to reweigh the evidence to inflict the death sentence as though this were the original sentencing court.

Under our state statutory system relating to death penalties, in the original trial in the District Court, the jury is given the function of determining from the facts whether a crime permitting the death penalty has been committed (the conviction phase). If the jury determines that such a crime has been committed, then it becomes the function of the district court judge to determine from the jury verdict whether an aggravating factor listed in the statute exists in the crime, and against that aggravating factor or factors, to weigh any mitigating evidence which would militate against the death penalty (the sentencing phase). It is only from

these functions of the jury and the sentencing district court that this Court has any appellate authority or jurisdiction: it does not have authority or jurisdiction other than to review the sentence imposed by the District Court or to consider the conviction by way of appeal. For ease in handling either or both of the two appellate functions, § 46-18-308, MCA, allows this Court to consolidate the appeal from any judgment of conviction with the automatic review by the Supreme Court of the death sentence.

At foot in this case is the proper interpretation of the United States Supreme Court cases of Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and a successor case, Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

Enmund held that the death penalty may be imposed on a defendant who killed, attempted to kill or intended to kill the victim or that lethal force was used. Tison expanded that concept to allow the death sentence where the defendant was a major participator in the felony committed, combined with his reckless indifference to human life.

This case presents an anomaly in the two-pronged system, the jury as trier of the offense, and the judge as the sentencer. In the appeal phase of the case, we can uphold the judgment of conviction for the crime alleged if it is supported by substantial evidence in the cause. In the sentence appeal, however, this Court reviews a different function: the District Court may impose the death penalty in this case only if the defendant killed, attempted to kill or intended to kill the victim or if he was a major participant in the felony with a reckless indifference to human life.

Thus, under the felony-murder rule, the required mental state of the defendant may be supplied for the conviction for murder because of the commission by the defendant of the accompanying crime. However, for the imposition of the death penalty, the mental state of the defendant who did not participate in the actual killing must be separately found, not in the felony-murder rule,

79

but in a specific finding that he was a major participant, with reckless indifference to human life. <u>Tison</u>, supra. In a death penalty case, that element should appear beyond a reasonable doubt.

Vernon Kills On Top was not present when John Etchemendy was killed. That killing took place when Diane Bull Coming and Lester Kills On Top drove off, apparently without telling Vernon Kills On Top or his companion what was up, and Diane Bull Coming and Lester Kills On Top went separately to consummate the foul deed. <u>The only evidence of Vernon's mental state as to whether he was recklessly indifferent to the death of the victim comes from an accomplice, Diane Bull Coming, and that particular point of evidence is uncorroborated</u>.

Thus, that Vernon Kills On Top was guilty of felony-murder under the statutes, is one matter upon which we can agree, because his mental state is supplied in the commission of the felony-murder. Whether, however, his mental state qualifies for the death penalty under <u>Enmund</u> and <u>Tison</u>, is quite another matter. It depends solely on the evidence of Diane Bull Coming, a not very savory participant or witness in this matter at best.

The gist of Diane Bull Coming's testimony on this point is that on two occasions Vernon Kills On Top agreed with Lester Kills On Top, a dominant personality, that Etchemendy had to die. On each occasion, however, Vernon counseled Lester "to wait." That evidence is as amenable to a lack of mental state on the part of Vernon Kills On Top of a reckless indifference to human life, as the presence of such a mental state. Strongly bearing on this question is the fact that Diane and Lester drove off for the actual killing despite the counsel to wait of Vernon Kills On Top, and Diane and Lester proceeded at some distanct place to end the life of Etchemendy.

There is a factor in the credibility of Diane Bull Coming that this Court's majority have not met or attempted to explain. Diane was charged upon her arrest with the crime of aggravated kidnapping, for which a death penalty is possible, and with robbery. After 279 days in the Miles City jail (described as a

basement jail) she entered into a plea bargain with the State, whereby, in exchange for her testimony against Lester Kills On Top, Vernon Kills On Top and Doretta Four Bear, the charge of aggravated kidnapping against Diane was dropped. Diane pleaded guilty only to robbery, and was given a 40-year sentence, but as a non-dangerous offender, she is eligible for parole in about eight years. Because of that background, when she testified in Vernon's case here her demeanor on the witness stand would be imperative for any trier of fact to judge of her credibility.

Moreover, when the majority speak of proportionality in comparing Vernon's death sentence to other Montana cases, they overlook the complete lack of proportion in the sentence given Vernon, compared to the eight-year sentence given Diane, a fully-acting participant from beginning to end, including the actual killing of Etchemendy.

There are other factors in Diane's testimony which shake me as to her credibility. She testified that Vernon and Lester stole the wallet from Etchemendy. The other woman in the automobile, Lavonne Quiroz, testified that it was Lester and Diane who stole the wallet and divided the proceeds, with Diane eventually giving a fifty dollar bill to Lester, a bill which he lost and Diane eventually got back. Lester Kills On Top testified that it was Diane herself who got the wallet from Etchemendy. Further, Diane pleaded guilty to robbery.

On another point respecting reckless indifference for human life, Diane Bull Coming testified that when Etchemendy was in the trunk of the car, Vernon mixed a beverage of beer and EverClear (EverClear is 180 proof alcohol) and attempted to force it down Etchemendy's throat. Lavonne, however, testified that it was Diane who prepared the beverage and attempted to force the mixture into Etchemendy. Here again the testimony of Diane Bull Coming is uncorroborated.

The majority sets out a number of factors which they say corroborate the testimony of Diane Bull Coming. All that those factors corroborate, however, is that Lester was present for a

felony- murder offense. The essential point that relates to his state of mind for the imposition of the death penalty, as to his reckless indifference to the life of Etchemendy, comes from Diane's uncorroborated statements against which there is evidence otherwise, including the fact that it was Lester who placed a blanket over the body of Etchemendy when he was still alive and in the trunk.

I will not belabor the other reasons I oppose the death penalty in this case. They are the same as for Lester Kills on Top as set forth in my dissenting opinion there and which apply equally here. 787 P.2d at 355-359.

I would uphold the conviction of Vernon Kills On Top on the basis of felony-murder rule and reverse the imposition of the death penalty.

John C. Sheehy
_____
Justice

Justice William E. Hunt, Sr., dissenting:

I concur with the majority opinion so far as it affirms the conviction of the defendant/appellant but because he was not present at the time of the victim's death, I would reverse the death sentence.

*William E Hunt Sr*
Justice